GARY v. McKINNEY et ux. (No. 1306.)

(Court of Civil Appeals of Texas. El Paso. March 2, 1922.)

1. Acknowledgment 55(1)—Rule against impeaching certificate not available to fraudulent purchasers.

The rule that a certificate of acknowledgment, regular in form, cannot be impeached in the absence of evidence showing that adverse party had notice of the failure of the officer to discharge his duty prior to the payment of the consideration, is for the protection of innocent purchasers for value and will not protect a fraudulent purchaser, or one who is not entitled to assert the equity of a purchaser for value.

2. Acknowledgment 55(1)—Certificate of acknowledgment of oil lease held subject to impeachment where lessee was not purchaser for value.

Certificate of acknowledgment to an oil lease, though regular in form, could be impeached as against lessee whose agent with his knowledge obtained a lease on land which lessors had not agreed to give, executed by lessors in ignorance of the fact that it covered such land; lessee not being a purchaser for value.

3. Acknowledgment 55(1)—Certificate of acknowledgment subject to impeachment as against lessee could be impeached as to lessee's assignee.

Certificate of acknowledgment of oil lease, which could be impeached as against the lessee because the lessee was not a purchaser for value, could be impeached as against lessee's assignee, since assignee's position was not more favorable than that of his assignor.

4. Appeal and error 930(3)—Presumed that court found issues not found by jury.

Findings of the jury on special issues will be presumed, in support of the judgment, to have been supplemented by findings of the court under Rev. St. art. 1985.

5. Contracts 10(1)—Unilateral contract valid if supported by independent consideration.

A unilateral contract is valid if supported by an independent consideration.

6. Mines and minerals 59—Oil lease properly canceled in view of unilateral character.

Where the cash consideration of $1 recited in an oil lease was not in fact paid and no well had been drilled, the lease was properly canceled in view of its unilateral character.

Appeal from District Court, Howard County; W. P. Leslie, Judge.

Suit by T. J. McKinney and wife against F. F. Gary. Judgment for plaintiffs, and defendant appeals. Affirmed.

Littler & Debenport, of Big Spring, for appellant.

---

Morrison & Morrison, of Big Spring, for appellees.

HIGGINS, J. T. J. McKinney and wife, R. L. McKinney, on December 21, 1920, brought this suit against F. F. Gary, assignee of Matt Burns, to set aside and cancel an oil and gas lease dated December 5, 1918, executed by McKinney and wife as lessors to Matt Burns, lessee, upon the west one-half of section 14, in block 32, township 1 north, Texas & Pacific Railway Company, in Howard county. About 100 acres of the land was part of the homestead of the plaintiffs.

The petition set up four grounds upon which cancellation was sought, which, briefly stated, are as follows:

First. That the plaintiffs agreed with Tunstill to lease only the east half of the land, which lease was to be to one Young for $50; that they signed the two instruments without reading them; that Tunstill falsely represented to them that they both related to the east one-half, upon which representations they relied and acted.

Second. That the cash consideration of $1 rental in the lease was not in fact paid and the contract was unilateral.

Third. That part of the land was homestead in character, and the notary who took the acknowledgment of Mrs. McKinney did not explain the instrument to her, did not take her acknowledgment privily and apart from her husband, and did not ask her the questions required by law in taking the acknowledgment of a married woman.

Fourth. That as an inducement to them to lease the land Tunstill falsely and fraudulently represented that his principal, Young, intended to drill a well as soon as he secured sufficient acreage leased.

According to the testimony of T. J. McKinney, he was approached by one W. A. Tunstill about December 1, 1918. Tunstill informed him he was representing a Mr. Young in obtaining leases; that as soon as he could obtain leases on a sufficient acreage Young would drill, and inquired if McKinney would lease his land. McKinney informed Tunstill that he would not lease all, but would lease one-half thereof. Tunstill said he did not want all of it and offered him $50 for one-half of the section. McKinney then went home and conferred with his wife, and they decided to lease the east half of the land. A few days later they went to town. Tunstill informed them that the papers had been turned over to Sam Smith, a notary at the bank. The McKinneys then went to the bank and signed and acknowledged two leases before Mr. Smith. One of the leases was to Young and covered the east half of the land. The other was to Burns and covered the west one-half. Both of the McKinneys testified that they signed the leases without reading them; that they thought both instruments related to the same one-half of the land. Mr. McKinney's testimony in this connection was:

"And when I signed this, I noticed there were two papers, and I says, 'Sam, what does this mean?' and he says, 'That is just a form.' I says, 'Here is one dollar here,' and he says, 'That is just a form.' I was just leasing half, and I didn't look into it; I just thought it was an oil lease and it couldn't be otherwise. * * *

"The officer did not explain it in any way; only that it was just a form. * * *

"There was no explanation made about the contracts at all when I went to sign the contract. * * *

"I asked Mr. Smith what was that extra page for, and he said it was just a part of the other, and I went ahead without looking, without reading it or doing anything, and signed both of the papers. * * *

"Mr. Smith didn't ask her anything, and I don't know whether he ever signed it or not. I asked him, I said, 'Sam, what is this extra sheet?' and he said, 'It is a form,' and I signed it, and she signed it, and we went off. There was just one lease, on the east side of it; there couldn't be but just one lease, and it was late, and it was pretty long, and you would have to have a spyglass to read some of it, and I didn't offer to read it at all. He didn't tell me that it was a lease covering the east half and the west half, too; if he had, I wouldn't have signed it. He said the lease was ready. This is the first time I mentioned the lease to him, and I couldn't say whether he understood that they were to have a lease on the whole section or half of it. * * *"

Mrs. McKinney testified that they went to the bank, and she signed what she supposed was the contract for the east one-half without reading it, and that the notary did not read it to her or explain its contents.

It was further testified by McKinney that he received nothing at the time the papers were signed, but about three months later received $50, which was to cover the east one-half of the land.

The lease covering the west one-half of the land recites a cash consideration of $1. It demises, leases, and lets the land "unto the said lessee, his heirs and assigns, exclusively, for the sole and only purpose of operating for and producing oil and gas thereon and therefrom, together with rights of way, * * * for the term of ten years from date hereof, and as much longer thereafter as oil or gas shall be produced therefrom, or royalties paid hereunder, or as much longer thereafter as the lessee in good faith shall conduct drilling operations thereon, and should production result from such operations, this lease shall remain in force as long as oil or gas shall be produced. * * *"

It further provides in the usual form that if no well was commenced on the land on or before December 30, 1919, the lease should terminate unless the lessee paid or tendered

$1 before that date as a rental for 12 months, and provides for like subsequent extensions by annual payments of such sum.

Special issues were submitted and answered as follows:

"Issue No. 1. Did T. J. McKinney agree with W. A. Tunstill to execute and deliver to Matt Burns the lease in question on the said west half of section 14, block No. 32, T. & P. Ry. Co.? A. No.

"Issue No. 2. If you answer the preceding issue, 'No,' then did W. A. Tunstill assure and represent to T. J. McKinney and R. L. McKinney that said lease, in evidence before you, covered the east one-half of said section? A. Yes.

"Issue No. 3. If you answer issue No. 2, 'Yes,' then:

"(a) Did said T. J. McKinney believe said representations, rely thereon, and was he induced thereby to execute and deliver said lease? A. Yes.

"(b) Did said R. L. McKinney believe said representations and rely thereon, and was she induced thereby to execute and deliver said lease? A. Yes.

"Issue No. 4. If you have answered issue No. 1 in the affirmative, then, did Mrs. R. L. McKinney on December 5, 1918, agree to execute and deliver to Matt Burns the lease in question on the west one-half of said section? A. No.

"Issue No. 5. Did Sam Smith, the notary taking the acknowledgment of Mrs. R. L. McKinney to said lease, fully explain said instrument to her before she signed and acknowledged the same? A. No.

"Issue No. 6. When the notary, Sam Smith, took the acknowledgment of Mrs. R. L. McKinney to said lease, was she 'privy and apart' from her husband? A. No."

Judgment was thereupon rendered in favor of the McKinneys canceling the lease.

The assignments will be considered in what is considered the most logical order, rather than in the order presented.

The sixth, seventh, and eighth assignments complain of the refusal of the court to set aside the findings upon issues 2 and 3. And by the fourth and fifth assignmnets it is insisted that there is no evidence of any fraudulent representations upon the part of Tunstill which induced the plaintiffs to execute the lease in question.

Mrs. McKinney testified that she never talked to Tunstill and that the only conversation she had relative thereto was with her husband and the notary.

Mr. McKinney testified in substance that Tunstill had told him that he had turned the papers over to Sam (the notary), and just before they started home he thought about the matter, and they went to the notary at the bank and signed the papers. This is all the evidence as to any conversation with Tunstill, and it is insufficient to support the findings attacked. These assignments are well taken.

Mrs. McKinney testified that the notary, Smith, did not explain the instrument to her, and that her husband was present when the acknowledgment was taken. Her husband testified to the same effect. The certificate of acknowledgment is regular.

Under the first assignment, error is assigned to the refusal of the court to strike out all evidence impeaching the regularity of the wife's acknowledgment, and the second and third assignments complain of the submission of issues 5 and 6 relative to such irregularity.

The proposition relied upon in effect is that, since the certificate was regular in form, it could not be impeached in the absence of evidence showing that either the lessee, Burns, his agent, Tunstill, or the assignee, Gary, had notice of the failure of the officer to discharge his duty, and that they had such notice prior to the time they paid for the lease.

[1] The rule in question is for the protection of innocent purchasers for value. It will not protect a fraudulent vendee, nor one who is not entitled to assert the equity of a purchaser for value. Crabb v. Bell (Tex. Civ. App.) 220 S. W. 623; Cole v. Bammert, 62 Tex. 112; Stallings v. Hullum, 79 Tex. 421, 15 S. W. 677; Wheelock v. Cavitt, 91 Tex. 679, 45 S. W. 796, 66 Am. St. Rep. 920; McEntire v Thomason (Tex. Civ. App.) 210 S. W. 563; De West v. Barthelow (Tex. Civ. App.) 136 S. W. 86.

[2] The plaintiffs testified that the $1 down consideration was never paid to them. The annual rentals of $1 subsequently accruing were tendered but declined. There is thus evidence to support a finding that Burns was not a purchaser for value. Furthermore, Burns is not entitled to the equity of a purchaser in good faith in view of the testimony of the plaintiff that the lease in question was executed in ignorance of the fact that it covered the west one-half, and that the written instruments covering the entire section did not reflect the real agreement which had been made by them with the agent, Tunstill. We do not think that Burns should be regarded as an innocent purchaser, or his agent, Tunstill, in accepting the lease must have known that he was obtaining a lease upon land which the parties had not agreed to give and which the husband had declined to give in the negotiations theretofore had.

[3] So far as the assignee, Gary, is concerned, his position is no more favorable than his assignor. National O. & P. L. Co. v. Teel, 95 Tex. 586, 68 S. W. 979. Furthermore, there is a total lack of evidence to show that he paid a valuable consideration for the lease. The record simply shows an agreement to the effect that Gary had a proper assignment.

[4] The first, second, and third assignments are therefore overruled. This disposes of all assignments presented by the

appellant, and in view of the findings upon issues 5 and 6, supplemented by the presumed findings of the court below (article 1985, R. S.), judgment was properly rendered for appellees for that portion of the land constituting their homestead. But the judgment as to all of the land cannot be upheld upon the theory that the acknowledgment of the wife was not taken as required by law, for her joinder in the lease was not necessary to its validity as respects that portion of the land which was not homestead in character.

[5, 6] However, the judgment as to the entire tract was proper in view of the unilateral character of the lease. A unilateral contract is valid if supported by an independent consideration, but the testimony of plaintiffs is that the independent consideration of $1 cash recited in this lease was not in fact paid and that no well had been drilled.

Affirmed.