## CARTER v. PORTWOOD.
### No. 3380.

Court of Civil Appeals of Texas. Amarillo.
March 19, 1930.

Rehearing Denied April 9, 1930.

Kay & Akin and Bullington, Boone, Humphrey & King, all of Wichita Falls, for appellant.

Taylor, Muse & Taylor and Carrigan, King & Surles, all of Wichita Falls, for appellee.

RANDOLPH, J.

The parties will be styled as in the trial court. This suit was filed by the plaintiff, Portwood, in the district court of Baylor county, against Roy I. Carter, defendant, seeking to recover the sum of $6,000, balance due on the sale of oil and gas leases upon two tracts of land. The case was transferred to the district court of Wichita county and there tried.

The case was submitted to a jury upon special issues, and, on the answers of the jury to such special issues, the trial court rendered judgment for the plaintiff, as prayed for. From this judgment, this appeal has been taken.

The plaintiff's petition alleges: That he was the owner in fee simple of certain land, situated in Baylor and Throckmorton counties, 60 acres of which were covered by the leases in controversy in this suit, and, further, that the defendant approached plaintiff with the view of leasing said acreage for oil and gas purposes, and that, after some discussion, plaintiff, on the 27th of November, 1925, leased to the defendant, for said oil and gas purposes, the 60 acres above mentioned, for a consideration of $125 per acre, or a sum total of $7,500. That, after the plaintiff and defendant had agreed upon the sale of the acreage so purchased, the defendant executed and delivered to the plaintiff his check, payable to W. H. Portwood or order in the sum of $1,500, and, at the time of the execution of such check, the defendant made the following notation upon it: "For 20 acres, 1279, and 40 Garrett"—and also made the following notation on it: "Part payment subject to title only." That it was agreed between the parties at that time that plaintiff was to execute two oil and gas leases to the defendant, covering such acreage, and place the same in the Farmers' National Bank of Seymour, Tex., for the defendant, which the plaintiff did on the 28th day of November, 1925, at which time said leases became the property of defendant, and that the plaintiff was to deliver to the defendant an abstract of title to said acreage, which the plaintiff did, and that defendant was to have said abstract of title examined by his attorneys, and, if said title was held to be a merchantable title by the attorneys, the plaintiff was to draw a draft on the defendant, in the sum of $6,000, balance due on the purchase price of said leases. That the defendant accepted said leases and also said abstract of title and placed same in the hands of his attorneys for examination, and that said attorneys examined said title as reflected by said abstract, and found same to be a merchantable title, thus maturing the balance of said consideration and binding the defendant for the payment of same. That the plaintiff, after learning that the title had been passed by the attorneys of defendant, and after said title had been decreed to be a merchantable title, and after the defendant had accepted said leases, did, on the 22d of December, 1925, draw a draft on the defendant for the sum of $6,000 for the balance of the purchase price of said leases. That plaintiff attached said draft to the two leases and sent the same, by due course of mail, to the City National Bank at Wichita Falls, Tex., for collection. That the defendant, upon presentation of the draft by said bank, failed and refused to pay same, and said draft was then returned to the Farmers' National Bank at Seymour.

After repeating other matters not material here, the plaintiff's petition further alleges that defendant took possession of said oil and gas leases and began to try to sell same, or a part thereof; alleging the taking of possession of the premises described in said leases, knowing full well that he had purchased same and also knowing all matters above recited.

Upon the question of the drawing of the draft, the plaintiff also alleges: That the "draft, in the sum of $6,000.00, was drawn upon the defendant, in pursuance of an absolute agreement between the plaintiff and defendant to draw said draft and in consideration of the balance due upon the purchase price of said leases, as agreed upon, and in pursuance of the request of the defendant to draw said draft, which would cover the balance of the purchase price of said leases," etc. That the said sum of $6,000 became due and payable on the 22d day of December, 1925, and the plaintiff is entitled to interest on same. The plaintiff further alleges that the draft was drawn upon the defendant in pursuance of an absolute agreement on the part of defendant to pay same in consideration of the balance due upon the purchase price of the leases, etc.

In his prayer for relief, the plaintiff prays for judgment for the sum of $6,000, and for a foreclosure of his implied lien.

The defendant's first amended original answer consists of general and special. exceptions, and a special plea, setting up the statute of frauds. The plaintiff replied to this by filing a supplemental petition.

As stated, the case was tried before a jury, and was submitted to them upon special issues. The issues submitted to them are as follows:

"Special Issue No. 1. At the time plaintiff Portwood signed and acknowledged the leases in the bank at Seymour, was T. D. Humphrey acting as the agent of the defendant Carter?" This was answered in the affirmative.

"Special Issue No. 2. In the negotiations between the plaintiff and defendant at the oil well, was it agreed that the $1,500.00 check, given by the defendant to plaintiff, should be

a forfeit or a partial payment of the consideration? Answer as you find the facts to be." —which was answered "Partial payment."

"Special Issue No. 3. If, in answer to special issue No. 1, you have said that Humphrey was acting as agent for defendant Carter, then was Humphrey authorized by Carter to receive the leases from Portwood and deposit them in the Seymour bank for Carter?" which was answered "Yes."

"Special Issue No. 4. Did Carter direct that the leases be sent to the Security National Bank for inspection of himself and his attorneys?" This was answered "No."

Special requested issue No. 2, submitted by the defendant and given by the court, is as follows: "Was it the understanding between the plaintiff and the defendant that the lease or leases in question were not to be delivered to Roy I. Carter until the balance of the purchase price of $6,000.00 was paid by Roy I. Carter?" This was answered in the affirmative.

The plaintiff's contention is that the sale of the leases was a completed transaction; hence he had a right to sue for the purchase money, and, further, that the statute of frauds, requiring the contract to be in writing, does not apply, as nothing remained to be done, delivery having been made and the transaction completed with the exception that the balance of the purchase money had not been paid. If this contention is correct, then it would naturally follow that the statute of frauds does not apply, and therefore the judgment of the trial court should be affirmed, but the defendant controverts the question of delivery having occurred, and, if he is correct in this, it remains for us to then determine whether or not the statute of frauds is applicable to the transaction presented in this case, and, if the statute is applicable, then the judgment of the trial court was erroneous.

If the transaction herein involved was not a completed one, then the two findings of the jury—one, in answer to issue No. 3, that Humphrey was acting as the agent of Carter and was authorized by Carter to receive the leases from Portwood and deposit them for Carter, evidencing a completed transaction, and their answer to defendant's special issue No. 2, that the leases in question were not to be delivered to Carter until the balance of the purchase price was paid by Carter, evidencing a transaction not fully completed—are in conflict. However, the plaintiff insists that, as the issues answered by the jury in their answer to defendant's special issue No. 2, present an immaterial issue, the trial court had the right to ignore such issue and answer and render judgment notwithstanding such answer, and for that reason no error was committed.

█ While we do not care to discuss the various holdings of our courts on the question of the right of a trial court to render a judgment "non obstante veredicto," we think that it is beyond question that the cases are uniform in holding that, where an issue is supported by the pleadings and the evidence and it is a material issue, the trial court had no authority to ignore such verdict and render judgment contrary to the finding. Heimer v. Yates (Tex. Com. App.) 210 S. W. 680; Houston & Tex. C. Ry. Co. v. Strycharski, 92 Tex. 1, 37 S. W. 415; Henne & Meyer v. Moultrie, 97 Tex. 216, 77 S. W. 607.

█ Was there such a delivery of the leases as evidences a completed transaction? For the purposes of solving this question, we must consider at length the testimony given on the trial.

It appears that the witness Humphrey was drilling a test well near the line of Baylor and Throckmorton counties in November, 1925; that the defendant asked witness what kind of a well he had. Witness told him that he did not know, that the well would not be open for inspection until Friday. Defendant came back Friday morning and met witness at the well, and defendant then told him that he would like to obtain some holdings nearby, if he could obtain them. Plaintiff came out later, about 10 o'clock. Witness introduced plaintiff and defendant, and this led up to a discussion of whether or not there was any unleased acreage that defendant could get. After the introduction of the parties, the evidence discloses that the plaintiff demanded $125 per acre for an oil and gas lease on his land, and that the defendant selected two tracts, one of 20 acres and another of 40 acres. The plaintiff had nothing to do with the defendant going out to look at the acreage. One of the parties called witness over to them, and one of them, he does not know which, told him that they had made a trade on those two pieces of acreage; they were both there at the time, and there was never any question raised to the effect that a trade had not been made. Witness was then asked if he had any blank leases, and he told them he did not have. The defendant then produced a check and asked plaintiff how much he wanted up on the lease at that time, and plaintiff said: "I do not know, Mr. Carter. I have been advised that you are all right, you are responsible." Defendant then told plaintiff he could call up his bank or some one else and that he could put up any part or whatever suited the plaintiff; that it was customary to put up a certain per cent. of it, while the title was being examined. They finally agreed on $1,500. One or the other of them asked witness to write the check, and witness did write it. He sat down on the running-board of the car and wrote it, and the defendant at that time said, "Just make that forfeiture;" and plaintiff spoke up and said, "I do not sell my leases that way; I know my title is good;" and then he said, "Just write it and make it part pay-

ment;" and that was written on the front of the check. Witness then identified the check, and testified that the notation in "penwriting" was on it at the time it was delivered to the plaintiff.

Witness further testifies that the defendant asked him, inasmuch as he was going to Seymour, that he would see that the leases were properly filled out according to the acreage as shown on the check, and wanted to know if he would fix up the leases for him, and have them executed by the plaintiff and delivered to the Farmers' National Bank at Seymour. Defendant knew that the witness had been drawing leases. The leases were to be 88 commercial·form, 3-year leases, and were to be for $1 per year rental, and be placed in the Farmers' National Bank at Seymour until defendant could have his attorneys examine the title, showing that he had a good, mer-. chantable title.

After the check was written, the witness drew the leases late that afternoon in the Farmers' National Bank at Seymour, and had the plaintiff sign them and placed them in that bank. That was done after defendant told witness to draw them and to put them in the said bank, according to the defendant's instructions. The plaintiff had nothing to do with drawing them. The plaintiff signed and acknowledged them before Baskin, an officer of the bank, and witness then delivered the leases to Baskin and told him that the defendant would call for them. The witness denies putting on one of the leases the notation, "$1,500.00 part payment, $6,000.00 due before delivering," and says that said notation was not on these leases when they were left in the bank. The check has on it, "subject to title only."

Witness then says: "At the time they asked me to write a check for $1,500.00, Mr. Carter said 'Make that a forfeiture check.' Mr. Portwood then said, 'No, Mr. Carter, I will not sell my land that way. My land has good title. Whenever it is sold, whenever you buy it, you can expect to pay because you will find the title good.' And then he said 'Well, make the check for part payment,' and that was what I wrote on the check, 'This check in part payment.' Something was said about the title, the abstracts, would be brought to Wichita Falls, it would be examined by Wichita Falls attorneys and when they were approved, showing good and merchantable title, then he would pay the balance."

After the leases·had been left in the Seymour bank, the witness called on the plaintiff with reference to seeing the condition of the title. This was some ten days or two weeks later. The defendant told witness that he had to deliver to Judge Kay the abstracts and "that form," and the witness could go to him and find out. He (the defendant) at witness' request, dictated a letter to his attorneys, and witness went down to their office and got an opinion. This opinion was an approval of the title, signed· by defendant's attorneys. After the witness secured this opinion, he mailed it to the plaintiff, and the plaintiff then wanted to know why he had not received the balance of the purchase money. No one had instructed witness to give the bank any written instructions about the leases, and witness did not know at the time he took them to the bank that they were to be attached to the draft, and the witness did not know that, if the title was approved, the bank of plaintiff was to draw on the City National Bank at Wichita Falls, with the leases attached, for the money.

Portwood, the plaintiff, testified in part that he never saw the notation on the leases, which says, $1,500.00 paid, $6,000.00 balance due before delivery"; that was not on the leases at the time he signed and acknowledged them; and that he never saw it until his attorney showed it to him a short time before the time he was testifying.

When Carter said he would write the check as a forfeiture, witness told him "No," that he did not make those kind of trades, that, whenever he traded, he always stuck to it and wanted to fix the other fellow so that he would have to stick, and that he knew he was good, and that they could hold him to whatever he agreed to do, and he wanted the other fellow to be held. Plaintiff told defendant then that $1,500 would do as part payment on the two leases, subject to title only, for $1,500. They put that on the check. The notation is on the check that he suggested, and this was after defendant's suggestion that it was to be a forfeiture. Witness further testified that Carter told Humphrey to make the notation on the check, showing that it was a part payment subject to title only and not a forfeiture, and that that would hold the trade good on both parties. Witness told Humphrey to put the leases in the bank where he did business (the Farmers' National Bank at Seymour). When witness had the leases put in the bank, so far as he was concerned, Carter could come in and get them any time. When the title was passed, witness notified the Farmers' National Bank. The banker drew up the draft, and witness signed it.

Plaintiff then testified: "I was there in· the bank to see if he took them up. It was some of the bankers who wrote out that draft. I did not. I signed that draft and it came on. At the time the draft was sent from that bank here, I believe that I got in my car and came down here and got Mr. Humphrey and went to Mr. Carter to see why he had not paid it. I saw Mr. Carter in his office. When I asked him why he had not paid was when he told me that some parties that had agreed to take some of the acreage had fallen down on him."

This presents succinctly the transaction between the parties. The plaintiff admits that he had the leases put in the Farmers'

426

National Bank and that he expected his money. Regardless of the notation made on the leases, and as to who made it, it is evident that the transaction was not completed until the money was paid.

We then come to the question that the oral contract for the sale of the leases was one that comes under the requirements of the statute of frauds. The contract must have been in writing, must have described the land to be conveyed, and must have been signed by the defendant, who was to be charged thereby.

 In order that a parol sale of land, or a lease on land, be relieved from the operation of the statute of frauds, there must have been (1) the payment of the consideration; (2) the taking into possession of the land by the vendee; and (3) the making of valuable and permanent improvements by the vendee.

While the plaintiff alleges in his petition that the defendant took possession of the premises conveyed by the leases, the evidence wholly fails to substantiate this charge. Certainly there were no permanent and valuable improvements placed on the leases. Hooks v. Bridgewater, 111 Tex. 122, 229' S. W. 1114, 15 A. L. R. 216; Fluhman v. Matthewson, 24 S.W.(2d) 751, opinion handed down by this court on January 29, 1930.

For the reason that the issues noted are in conflict and that the trial court had no power to ignore the conflict and render judgment "non obstante veredicto," and for the reason that this, being an oral contract, comes under the operation of the statute of frauds, we reverse the judgment of the trial court, and remand the case to that court for another trial.