**GULF PRODUCTION CO. et al. v. CONTI-
NENTAL OIL CO. et al.**

No. 6641.

Supreme Court of Texas.

Nov. 1, 1939.

558

Black, Graves & Stayton and C. L. Black, all of Austin, Williams, Neethe & Williams and F. A. Williams, all of Galveston, John E. Green, Jr., of Houston, Wm. L. Wise and Peveril O. Settle, both of Fort Worth, C. L. Stone, of Henderson, and H. L. Stone, of Pittsburg, Pa. (Claude McCaleb, of Houston, and R. L. Batts, of Austin, for plaintiff in error Gulf Production Co.

Brachfield & Wolfe, of Henderson, McKinney & Berry, of Cooper, Hiner & Pannill, of Fort Worth, Wm. Pannill, of Houston, and Ben H. Powell, of Austin, for Turner and Wife.

Phillips & Phillips, W. H. Francis, and Walace Hawkins, all of Dallas, Lloyd Price, Burney Braly, G. R. Pate Phillips, Trammell, Chizum, Price & Estes, T. S. Christopher, Clayton L. Orn, Joe E. Estes, and John A. Braly, all of Fort Worth, McEntire, James & Clower, of Tyler, Dan Moody and G. B. Smedley, both of Austin, and Eugene Lary, of Dallas, for defendants in error Continental Oil Co., and others.

CURETON, Chief Justice.

This case is before the Court by writ of error from the Court of Civil Appeals for the Sixth District. The opinion of that court may be found in 61 S.W.2d 185, and is here referred to for a general statement of the case. The Continental Oil Company, East Texas Refining Company, H. L. Hunt, and P. G. Lake, as plaintiffs in the trial Court (defendants in error here), filed this suit against G. G. Turner and wife, Sina A. Turner, and the Gulf Production Company (plaintiffs in error here) to recover the oil and gas leasehold estate in a certain 311.72 acres of land, more or less, in Rusk County, Texas. The defendants in error claim title under an oil and gas lease from G. G. Turner and wife, Sina A. Turner, to C. M. Joiner, Trustee, dated April 7, 1927. The Gulf Production Company title is through and under a similar lease executed by the said G. G. Turner and wife, Sina A. Turner, to J. W. Pevey, dated July 25, 1930. At the time of the

trial below the Gulf Production Company was in possession under its lease, had brought in seven producing wells, and was then drilling another, all at a cost to the company up to that time of $149,725. The suit was brought by defendants in error in the form of an action in trespass to try title, but they specially pleaded the Turner lease of April 7, 1927, and compliance with its terms as the source of their title. The primary question is: Which lease is to be given effect? The lease of defendants in error is in the usual form of oil and gas leases. G. G. Turner and wife, Sina A. Turner, are named as lessors, and *C. M. Joiner, Trustee,* as lessee.

The lease sets out the field notes of the land, was to run five years, and as long thereafter as oil or gas might be produced.

Both G. G. Turner and his wife first acknowledged this lease in statutory form on the 7th day of April, 1927, before G. P. Birdwell, Notary Public for Rusk County, Texas. More than three years thereafter, viz., on the 18th day of October, 1930, both G. G. Turner and his wife, S. A. Turner, again acknowledged the execution of this instrument, in statutory form, before James A. Copeland, Notary Public for Harris County, Texas. The lease was twice filed for record in Rusk County; first on the 15th day of April, 1927, and again on February 17, 1931.

The "drilling clause" of the lease reads: "If no well be commenced on said land on or before the 7 day of April 1928 this lease shall terminate as to both parties, *unless* the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First State Bank at Overton, Texas, or its successors, which shall continue as the depository, regardless of changes in the ownership of said land, the sum of Seventy Seven and 25/100 Dollars, which shall operate as rental and cover the privilege of deferring the commencement of a well for Six (6) months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the *lessee's option* of extending that period

as aforesaid, and any and all other rights conferred." (Italics ours.)

The plaintiffs in error say that the above "unless" clause was never complied with, and that the lease terminated by its own limitations on April 7, 1928, long before Pevey, through whom the Gulf Production Company claims, obtained his lease from the Turners. Defendants in error say in their pleadings that they claim *"through and under said lease, and subject to the terms of said lease."* and *"upon which all delay rental obligations had been fully satisfied and discharged."*

Although Mr. and Mrs. Turner denied that anything of the sort ever took place, the jury, answering special issues, found that G. G. Turner and wife, Sina A. Turner, prior to April 7, 1928, accepted from Dan Cameron syndicate interest certificates purporting to cover the 80-acres Joiner discovery well tract (on the Daisy Bradford land), in satisfaction of the rentals payable under the lease for the three succeeding years, commencing April 7, 1928. The syndicate interest certificate transaction took place between G. G. Turner, alone, and Dan Cameron, a representative of C. M. Joiner, Trustee,—Mrs. Turner not being present. Concerning the transaction, Cameron in part testified:

"I called on Mr. Turner at least a week and possibly two weeks prior to the date on which the rental was due to talk to him about the rental money and Mr. Turner was up on his barn or car shed and I went out there and went up there and told him that Mr. Joiner was having work and a hard time in keeping the work up and well drilling and to pay the rentals and if he did have to continue to pay the rentals on the land down there that it would be impossible for him to continue to drill the well, because it was very difficult for him to get the money--and that the only thing he could do to keep the work going on down there was to get the folks that owned--that he had the land leased from, to accept in lieu of their rentals and in payment of their rentals the syndicate interest.

\* \* \* \* \*

"That was the syndicate interest in the well he was then drilling and Mr. Turner told me that he thought a good deal of Mr. Joiner and would do anything on earth to help him come out and he expressed himself that he had a very high regard for

Mr. Joiner and also he knew that Mr. Joiner had been having an awful hard time to keep this well going * * * Mr. Turner told me he was willing to accept the syndicate interest in the well for his rental and he said that there would not be any rentals anyhow if Mr. Joiner was not drilling and the rentals didn't amount to anything to him and he was glad to accept in lieu of the rentals the syndicate interest in this well down there.

 * * * * *

"I made out Mr. Turner a syndicate interest for his rentals and delivered it to him.

 * * * * *

"I had a pad of those forms like that, the original and the duplicate, and I had a carbon in between them and I made out this certificate and then I gave one copy to Mr. Turner and I kept one copy for Mr. Joiner's records.

 * * * * *

"At the time I gave him the certificate I made out a rental receipt and got Mr. Turner to sign it.

 * * * * *

"At the time of the transaction with Mr. Turner he agreed to settle with me for three years rentals, from April 7, 1928.

 * * * * *

"Mr. Turner signed the rental receipt for the three years."

The above transaction is the only basis for the claim that Joiner, Trustee, complied with the terms of the lease, and the Court of Civil Appeals held it was sufficient for that purpose.

The homestead of Turner and his wife was located on the land, and had been for more than fifty years. The Court of Civil Appeals held that after the execution of the lease by the Turners they had no homestead rights whatever in or to the property, in part saying [61 S.W.2d 188: "So the conveyance of the determinable fee by G. G. Turner and wife carried with it the exclusive right of possession, and that remaining in the Turners after the conveyance being only a right of reverter, not carrying with it a right of possession, until after the happening of the event that would terminate the estate, then no right of homestead could attach in favor of the Turners, a present right of possession being necessary for homestead rights to attach."

This holding is the basis of the court's conclusion that the syndicate interest certificate transaction was valid.

In our opinion, the terms of the lease negative any purpose to grant or to abandon the homestead or the possession of the premises, or any interest therein not necessary for carrying into effect the lease itself. The lease expressly states that Joiner, Trustee, and his vendees, *could not use the "water wells of the lessor"*; that *"when requested by lessor, lessee shall bury all pipe line below plow depth"*; that *"no well shall be drilled nearer than 200 feet to the house or barn on said premises, without the written consent of the lessor"*; and *"Lessee shall pay for damages caused by all operations to growing crops on said land."*

These clauses, it seems to us, show beyond dispute that it was contemplated by the very terms of the lease itself that Turner and wife should continue in possession of their home, house, wells, barn, and continue to cultivate the land, and make such use of it as could be made, in so far as might be consistent with the exercise of the right to drill and produce oil therefrom. Moreover, as to the surface of the land, the only grant made by the Turners was in the nature of an easement that it might be employed in the production of oil and gas. That surface, and everything in the land itself, except the minerals covered by the lease, was still *in their possession and was their property*, subject to a reasonable use, qualified only by the express provisions of the lease, to which we have made reference. Summers on Oil & Gas, Permanent Edition, volume 4, page 2, § 652. So, it cannot be said, as the Court of Civil Appeals holds, that the right of the Turners was only "a right of reverter not carrying with it a right of possession." Quite contrary to this conclusion of the Court of Civil Appeals is a paragraph in the reply of defendants in error to the application for writ of error filed in this cause, which reads: "It has never been contended by defendants in error that they are entitled to the exclusive possession of the entire estate in the Turner land. *On the contrary, the title and right of the lessors, the Turners, to the use and occupancy of the surface of the land,* such as is reserved to every lessor under the ordinary oil and gas lease, *has never been and is not now in dispute."* (Italics ours.)

562

■ This Court has long recognized the right of a landowner to sever the surface and mineral estates, and convey the latter without conveying or destroying the former. 31 Tex.Jur. p. 547, secs. 23, 24, 25, 26, 27, p. 601, sec. 49; Humphreys-Mexia Oil Co. v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607; Lemar v. Garner, 121 Tex. 502, 511, 50 S.W.2d 769; Munsey v. Mills & Garitty, 115 Tex. 469, 482, 283 S.W. 754; Grissom v. Anderson, 125 Tex. 26, 30, 79 S.W.2d 619. *The surface estate remaining in the lessor is one in fee simple, and includes the rights of possession, powers of control, occupancy, use and alienation.* Authorities supra; 31 Tex.Jur. p. 556, sec. 26, p. 601, sec. 49; Summers on Oil & Gas, Permanent Edition, volume 4, page 2, § 652; Ferguson v. Steen, Tex. Civ.App., 293 S.W. 318; Rosson v. Bennett, Tex.Civ.App., 294 S.W. 660; Gregg v. Caldwell-Guadalupe Pick-Up Stations, Tex.Com.App., 286 S.W. 1083; Humble Oil & Refining Co. v. Wood, Tex.Com.App., 292 S.W. 200; Humphreys Oil Co. v. Liles, Tex.Com.App., 277 S.W. 100; Praeletorian Diamond Oil Ass'n v. Garvey, Tex.Civ.App., 15 S.W.2d 698, writ refused; Johnson v. Phillips Petroleum Co., Tex.Civ.App., 93 S.W.2d 556; Fowler v. Delaplain, 79 Ohio St. 279, 87 N.E. 260, 21 L.R.A.,N.S., 100; Franz Corp. v. Fifer, 9 Cir., 295 F. 106, 108; Schlegel v. Kinzie, 158 Okl. 93, 12 P.2d 223; Pulaski Oil Co. v. Conner, 62 Okl. 211, 162 P. 464, L.R.A. 1917C, 1190.

■ Of course, in a lease of this character the surface estate is servient to the mineral estate for the purposes of the mineral grant, but even this right is to be reasonably exercised with due regard to the rights of the owner of the surface. 31 Tex.Jur. p. 558, sec. 27; Mills-Willingham Law of Oil & Gas, pp. 250, 251, 252; Thornton on Oil & Gas, 4th Ed., vol. 1, p. 249, sec. 82; 5th Ed., vol. 1, p. 235, sec. 131; Gregg v. Caldwell-Guadalupe Pickup Stations, Tex.Com.App., 286 S.W. 1083; Grubstake Inv. Ass'n v. Coyle, Tex.Civ. App., 269 S.W. 854; Brown v. Spilman, 155 U.S. 665, 15 S.Ct. 245, 39 L.Ed. 304; Gulf Pipe Line Co. v. Pawnee-Tulsa Petroleum Co., 34 Okl. 775, 127 P. 252, 41 L.R.A.,N.S., at pages 1108, 1110; Summers on Oil & Gas, supra.

■ It is clear to us that the Turners did retain and have such possession and ownership of the homestead property as was sufficient for the homestead right to continue to attach. 22 Tex.Jur. p. 236, sec. 164, p. 243, sec. 169; Speer on Marital Rights, 3d Ed., sec. 468; Wheatley v. Griffin, 60 Tex. 209, 211; Swearingen v. Bassett, 65 Tex. 267; Lee v. Welborne, 71 Tex. 500, 9 S.W. 471; Stratton v. Westchester Fire Ins. Co., Tex.Civ.App., 182 S.W. 4 writ refused; Finley v. Wakefield, Tex.Civ.App., 184 S.W. 755, 758, writ refused; First Nat. Bank v. Dismukes, Tex.Civ.App., 241 S.W. 199.

Since we have determined that the Turners did continue to have a homestead estate in the land covered by the lease, it follows that the basis of the holding of the Court of Civil Appeals that Turner had the right to accept the syndicate certificates in continuation of the lease because no homestead rights existed (61 S.W.2d 185, 188) passes out of the case, with the result that the conclusion of the court sustaining the validity of the transaction is necessarily erroneous.

■ The insistence here, however, is that since Turner had the right under the law, as head of the community, to collect, receive, and dispose of the proceeds of the homestead, he had the right to accept the syndicate interest certificates. We recognize the rule that the *proceeds* of a sale of the homestead property, *if personalty,* are subject to the control of the husband. 22 Tex.Jur. p. 130, sec. 92. *But here there were no proceeds.*

■ The lease here involved is an "unless lease," and imposed no obligation on Joiner, Trustee, to either drill or pay; and upon his failure to either drill, pay, or make the deposit in the named bank, no liability of any kind arose in favor of the Turners against him; nothing was due thereunder; there was nothing for Turner to collect; and nothing could be recovered. 31 Tex.Jur. p. 744, sec. 134, Davis v. Bussy, Tex.Civ.App., 298 S.W. 656, writ refused; Weiss v. Claborn, Tex.Civ.App., 219 S.W. 884, 887, writ refused; Stovall v. Texas Co., Tex.Civ.App., 262 S.W. 152, 153, writ refused; McLaughlin v. Brock, Tex.Civ. App., 225 S.W. 575, 577; Jones v. Murphy, Tex.Civ.App., 253 S.W. 634; Summers on Oil & Gas, Permanent Edition, volume 2, page 223, § 339.

■ The text of Texas Jurisprudence cited, sec. 134, in part reads: "It is clear from the wording of the 'unless' clause that it does not operate to impose any duty upon the lessee *either to drill or to pay*

**563**

*delay rentals;* the matter is entirely optional with him, and the lessor cannot compel him to drill nor oblige him to pay any rentals." 31 Tex.Jur., p. 744, sec. 134. (Italics ours.)

That the Court of Civil Appeals misinterpreted the meaning of the *"unless"* clause before us is plainly shown in one of the concluding sentences in its opinion, wherein the court said: "Turner's written authority to demand money in payment of rentals did not restrict his right to accept property in satisfaction thereof." 61 S.W. 2d 185, 188.

The error in this is obvious. Turner had no written authority, nor any other authority, under the lease *to demand* money in payment of rentals. *There were no rentals due, and under the lease there was no obligation due the Turners for the payment of which he could demand money.* The defendants in error "do not dispute" this proposition as applicable to an "unless lease." On page 48 of their "reply * * * to printed arguments filed by plaintiffs in error * * *" in this Court, they say: "It is insisted in all the arguments that there is never any obligation to pay the rentals that, at the option of the lessee, may be paid under an 'unless' lease. *The defendants in error do not dispute that proposition."*

For the reason stated, we are clear that Turner, under the rules of law which permit him to collect community debts, or settle obligations due the community, did not have authority to accept the syndicate interest certificates for the continuance of the lease on the homestead.

The result of the failure of Joiner, Trustee, to either begin a well, pay the specified amount of money, or make the named deposit by April 7, 1928, was to ipso facto terminate the lease, and the Turners became reinvested with the entire estate without the necessity of re-entry, declaration, or legal action. 31 Tex.Jur. pp. 744, 745, 746, sec. 134; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 520, 19 S.W.2d 27; Humble Oil & Ref. Co. v. Davis, Tex.Com.App., 296 S.W. 285, 287; Mitchell v. Simms, Tex.Com.App., 63 S. W.2d 371, 373; Weiss v. Claborn, Tex. Civ.App., 219 S.W. 884, writ refused; Wilson v. Gass, Tex.Civ.App., 289 S.W. 141, 142, writ refused; Morrissey v. Ambrugey, Tex.Civ.App., 292 S.W. 255, 256, writ refused; Thornton on Oil & Gas, 5th ed., vol. 1, sec. 124; Summers on Oil &

Gas, Permanent Edition, volume 2, pages 217, 218, § 337; Empire Gas & Fuel Co. v. Saunders, 5 Cir., 22 F.2d 733, 735, writ of certiorari dismissed, 278 U.S. 581, 49 S.Ct. 184, 73 L.Ed. 518.

The "unless" provisions of the lease, therefore, are obviously a *limitation* on the grant; since *"a limitation determines an estate upon the happening of the event itself without the necessity of doing any act to regain the estate, such as reentry."* Thompson on Real Property, vol. 3, sec. 2092. (Italics ours.) Summers on Oil & Gas, Permanent Edition, volume 2, page 215, § 337; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 519, 520, 19 S.W. 2d 27; Humble Oil & Ref. Co. v. Davis, Tex.Com.App., 296 S.W. 285, 287; Caruthers v. Leonard, Tex.Com.App., 254 S.W. 779, 782; Morrissey v. Amburgey, Tex. Civ.App., 292 S.W. 255, 256, writ refused; authorities supra.

Under the statutes of Texas, the estate conveyed in a grant is "deemed a fee simple, if a less estate be not limited by express words or do not appear to have been granted * * *." R.S. Art. 1291. By reason of this statute, the intent to convey an estate in fee simple will be presumed where a less estate is not expressly and unequivocally declared. 14 Tex.Jur. p. 933, sec. 155; May v. S. & A. P. Townsite Co., 83 Tex. 502, 508, 18 S.W. 959; Lindsay v. Freeman, 83 Tex. 259, 263, 18 S.W. 727.

The conditions under which the lease before us could continue, and the length of time it could endure, were, *under the statute, just as much a part of the grant as the title to the oil and gas, or surface easement.*

It therefore appears that the "unless" provisions of the lease here involved, being words of limitation, the purpose of which is to specify *"the time of continuance or duration"* of the estate, constitute an *integral part of the very grant itself required by statute in order to prevent the grant from being one in fee simple.*

From Cameron's testimony, quoted above, it is apparent that the agreement between Cameron and Turner to extend the Turner lease for three years from April 7, 1928, for the syndicate interest certificates, was not in writing, but was verbal. So, what we really have before us is a parol agreement of Turner to accept the syndicate interest certificates for

the three years' rental named in the lease, a written document called a syndicate interest certificate, the contents of which we do not know, and according to the so-called duplicate in the record, a receipt for money, although no money was paid, signed by Turner, alone, but unacknowledged, for three years' rental.

Since the oral modification of the lease extended it for three years upon a new and different option and consideration to that written in the lease, changed by oral agreement the limitations written in the grant in compliance with the statute (R.S. Art. 1291), quoted above, it is obvious that it was in violation of both the Statute of Frauds and the Statute of Conveyances. R.S., Arts. 3995, 1288; 20 Tex.Jur. p. 215, sec. 6, pp. 283, 284, secs. 73, 74; Adams v. Hughes, Tex.Civ.App., 140 S.W. 1163, 1169, writ refused; Burgher & Co. v. Canter, Tex.Civ.App., 190 S.W. 1147; Schofield v. Pyron, Tex.Civ.App., 257 S.W. 350; Kistler v. Latham, Tex.Com.App., 255 S. W. 983, 985.

The defendants in error, under the lease as thus modified by the oral agreement, have a lease for some terms of which they must go to the original and executed document, and for others to the oral modification. It is quite elementary that in such a case the oral modification of a contract falling within the Statute of Frauds is itself within the statute. In fact, it may be correctly said that the oral modification of the written agreement creates a new contract, resting entirely in parol. 20 Tex.Jur. p. 213, sec. 6, p. 283, secs. 73, 74; Ickert v. Minor, Tex.Civ. App., 22 S.W.2d 741, 743; McDonald v. Whaley, Tex.Com.App., 244 S.W. 596, 598; Gardner v. Sittig, Tex.Civ.App., 188 S.W. 731; Allen v. Mulkey, Tex.Civ.App., 19 S. W.2d 936, 945; Kistler v. Latham, Tex. Com.App., 255 S.W. 983, 985; Adams v. Hughes, Tex.Civ.App., 140 S.W. 1163; Beard v. A. A. Gooch & Son, 62 Tex.Civ. App. 69, 130 S.W. 1022; Burgher & Co. v. Canter, Tex.Civ.App., 190 S.W. 1147; Ford Motor Co. v. Maddox Motor Co., Tex.Com.App., 23 S.W.2d 333, 338.

This is necessarily so, because only by parol can it be ascertained what portion of the written instrument is to remain effective and what portion has been eliminated or suspended by the syndicate interest certificate transaction. So, what we really have is a parol conveyance of an oil and gas lease on the Turner lands. The jury found that the syndicate interest certificates were delivered, but this does not take the contract which now rests entirely in parol out of the Statute of Frauds. In order to do this, not only must the consideration be paid, but possession must be delivered and valuable improvements made, neither of which was done. The agreement, therefore, cannot be enforced. 20 Tex.Jur. pp. 328, 337, secs. 116 to 124; Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216; Ward v. Etier, 113 Tex. 83, 251 S.W. 1028; Bradley v. Owsley, 74 Tex. 69, 11 S.W. 1052; Carter v. Portwood, Tex.Civ.App., 26 S.W.2d 422, 426; Leverett v. Leverett, Tex.Civ.App., 59 S.W.2d 252, 254, writ refused; City of N. Y. Ins. Co. v. Middleton, Tex.Civ.App., 62 S.W.2d 681, 682; Francis v. Thomas, 129 Tex. 579, 106 S.W.2d 257, 261.

The contract as modified by the oral agreement, being a conveyance of real estate without being in writing, was equally violative of the Statute of Conveyance. R.S., Art. 1288; Allen v. Allen, 101 Tex. 362, 365, 107 S.W. 528; Priddy v. Green, Tex.Civ.App., 220 S.W. 243, 248; Texas Co. v. Tankersley, Tex.Civ.App., 229 S.W. 672.

Defendants in error's proposition that the acceptance of the syndicate interest certificates in lieu of money was a mere substituted method of performance, is without merit. "A substituted method of performance" necessarily presupposes a contract to be *performed* and an obligation to be satisfied; otherwise, there is no "method of performance" for which some other method may be "substituted." In the lease before us *there was no obligation to be performed,* and therefore no method of performance for which something else could be substituted. Joiner had an option (it is called the *"lessee's option"* in the drilling clause previously quoted) to continue the lease, but he could not effectively exercise it by delivery of syndicate interest certificates, because that was not one of his options. Options must be accepted according to their terms, and leases of the character before us must be strictly complied with. 43 Tex.Jur. p. 100, sec. 62; 31 Tex.Jur. p. 759, sec. 141, p. 762, sec. 144, p. 764, sec. 145, p. 767, sec. 146. So, what actually took place was not a "substituted method of performance," but a substitution of another option for those named in the written lease, or the incorporation in the agreement of a fourth op-

tion, resting in *parol,* to the effect that if Joiner would deliver the syndicate interest certificates, the lease should be continued for three years. But the lease was an "unless" lease, and under it the options specified in the written document, in connection with the termination clause, were "limitations on the grant," an integral part of the very grant itself, required by the statute (R.S., Art. 1291) to prevent the passage of a fee simple title; which, of course, could not be changed by parol. The delivery of the certificates was not a "substituted performance" of the original agreement, but an original performance of the parol option attempted to be incorporated in the written document for the purpose of changing the limitations of the grant, in violation of the statutes.

 Defendants in error in their brief filed here on the proposition that the "unless" provisions of an oil and gas lease express a "condition subsequent," instead of a "limitation" (pages 49 and 50), concede that the doctrine of "substituted performance" can have no application to a grant upon a limitation. They say that a grantor *"cannot waive the results of the happening of an event to which the duration of an estate is limited,"* and (on page 48) "The grantor may waive or be estopped to assert the breach of a condition, or he may accept a substituted performance of it by parol, *while he cannot do so in the case of a limitation."* (All italics ours.)

Cases and authorities cited by defendants in error relative to parol modifications of actual obligations to pay rent, or actual obligations to pay royalties, or changing the method of paying royalties, have no application here, since these involve *substituted methods of performing* actual obligations; not, as here, the addition of a parol option and the substitution of an oral limitation for those written in the grant.

 The limitation in the lease was imposed on the grant by Mrs. Turner, the wife, *and operated in protection of her homestead right;* and G. G. Turner, the husband, alone, could no more enlarge, modify, or change it than he could alone make a valid grant or lease in the first instance, or change the determinable fee into a complete fee simple title, or the surface easement into a complete conveyance. The authorities declare the husband alone cannot contract for the renewal or ex-

tension of an obligation on the homestead, or that the *burden of an encumbrance may not be increased thereon without the wife's consent,* etc. 22 Tex.Jur. pp. 122, 123, sec. 86; 23 Tex.Jur., p. 271, sec. 236. "In a legal sense, the word 'incumbrance' means 'an estate, interest, or right in lands, diminishing their value to the general owner; a paramount right in, or weight upon, land which may lessen its value.'" Thomson v. Locke, 66 Tex. 383, 387, 1 S.W. 112, 114; 17 Tex.Jur., pp. 103, 104, sec. 2; City of Dayton v. Allred, 123 Tex. 60, 73, 68 S.W.2d 172; Stambaugh v. Smith, 23 Ohio St. 584, 591; Adams v. Reed, 11 Utah 480, 40 P. 720, 723; Words & Phrases, First Series, volume 4, page 3522; Flood v. Graham, 61 Fla. 207, 54 So. 456, Ann.Cas.1912D, page 1137; Words & Phrases, Second Series, volume 2, pages 1018–1022; Words & Phrases, Fourth Series, volume 2, pages 317, 319; Words & Phrases, Third Series, volume 4, pages 198–201; Krotzer v. Clark, 178 Cal. 736, 174 P. 657, 658; Thackeray v. Knight, 57 Utah 21, 192 P. 263, 265; Nacey v. Cheney, 67 Mont. 56, 214 P. 647, 649; Elliott on Roads and Streets, 4th Ed., vol. 2, sec. 921; Forster v. Scott, 136 N.Y. 577, 32 N.E. 976, 18 L.R.A. 543; Blackie v. Hudson, 117 Mass. 181; Cadmus v. Fagan, 47 N.J.L. 549, 4 A. 323; Kellogg v. Ingersoll, 2 Mass. 97, 101; Tuskegee Land Co. v. Birmingham R. Co., 161 Ala. 542, 49 So. 378, 23 L.R.A., N.S., 992; Mackey v. Harmon, 34 Minn. 168, 24 N.W. 702; Demars v. Koehler, 62 N.J.L. 203, 41 A. 720, 72 Am.St.Rep. 642. The last authorities cited hold that easements, including the right to take water, which is a mineral (40 Corpus Juris, p. 738, sec. 12), are within the quoted definition of "encumbrances." It is therefore obvious that the husband alone cannot change or modify limitations imposed by the wife in an original oil lease; for certainly a change in the limitations on the grant, in the conditions, compliance with which was necessary to its continuance, the purpose and claimed effect of which was to continue the grant for three years, was an "encumbrance," which diminished the value of the homestead property of Mrs. Turner. The husband cannot even accept a less amount of consideration than that specified in the wife's deed, and bind the wife. Cole v. Bammel, 62 Tex. 108; Stallings v. Hullum, 89 Tex. 431, 35 S.W. 2; Dodd v. Daniel, Tex.Civ.App., 89 S.W.2d 494.

These cases rest upon the principle that a change in the consideration to be paid for the homestead from that specified in the deed signed and acknowledged by the wife has the effect of making the conveyance upon terms which were not in her deed, and therefore not binding upon her.

In the case before us the principle applies with greater force than in the cases cited, because the effect of the syndicate certificate transaction was not only to substitute another and different consideration for that named in the lease, but at the same time to change the limitations of the grant, and cause its continuance for three years upon delivery of the certificate, an option not specified in the lease at all, a transaction resting entirely in parol. As said in Cole v. Bammel, cited above, *"Such a proceeding imposes upon the wife a different contract from that which she had explained to her, and, in effect, forces upon her a conveyance she may have been unwilling to execute. * * * and the beneficial design of the statute* .[R.S., Art. 1300] *is frustrated."*

Mrs. Turner's joinder was necessary in the creation of the limitation in the lease in the first instance, and is equally necessary to any valid change of this limitation. It would be an idle and futile thing for the Constitution and the statutes to require the joinder of the wife in the execution of the lease before us; to require her to separately acknowledge it after its contents *as written* had been explained to her by the notary; and to require the wife to limit the estate granted by express words if she desired it to be limited (R.S., Art. 1291), if the husband alone could modify or change the limitation on the grant imposed by her in her conveyance.

We are of the opinion that the syndicate interest certificate transaction was not only in violation of the Statute of Frauds and the Statute of Conveyances, as we have shown, but was in violation of the statutes governing homestead conveyances by husband and wife; was void as to Mrs. Turner, the wife; should not have been admitted in evidence in the first instance; and could not form the basis of a judgment in favor of defendants in error.

Mrs. Turner is not estopped as to her homestead by the syndicate interest certificate transaction, even though she did accept the certificates, or ratify the transaction, since there is no fraud shown on her part. 22 Tex.Jur. p. 137, sec. 96; 23 Tex.Jur. p. 315, sec. 275; Cauble v. Worsham, 96 Tex. 86, 93, 70 S.W. 737, 97 Am.St.Rep. 871; Durham v. Luce, Tex. Civ.App., 140 S.W. 850, 855; Daniel v. Mason, 90 Tex. 240, 244, 38 S.W. 161, 59 Am.St.Rep. 815; McLaren v. Jones, 89 Tex. 131, 135, 33 S.W. 849; Huss v. Wells, 17 Tex.Civ.App. 195, 44 S.W. 33, 34, writ refused; Owens v. New York & T. Land Co., 11 Tex.Civ.App. 284, 32 S.W. 189, 190, 1057, 1060; Washington v. City of Houston, Tex.Civ.App., 60 S.W.2d 519, 522, writ refused; Keels v. Metzler, Tex. Civ.App., 94 S.W.2d 799, 805; Speer's Law of Marital Rights, 3d Ed., secs. 197, 276.

Since the terms of the lease necessary to its continuance were not complied with by Joiner, Trustee, the lease automatically terminated on April 7, 1928, and from that date the whole title to the land here involved, including the mineral estate, was in Turner and wife; and they were at liberty to convey it to another. Mitchell v. Simms, Tex.Com.App., 63 S.W. 2d 371; authorities supra.

In addition to the foregoing, we have concluded that the lease was absolutely void as to the homestead, for the reason that Birdwell, the notary public who took the acknowledgments of Mr. and Mrs. Turner, was interested as a part owner or beneficiary of the estate conveyed, and was therefore disqualified to take the acknowledgments.

Birdwell's disqualification arose out of the following facts: On March 29, 1927, C. M. Joiner, Trustee, and W. D. Tucker entered into a partnership agreement, acknowledged by both Joiner and Tucker before G. P. Birdwell, a notary public, and its validity is not questioned. This agreement made Joiner, Trustee, and Tucker partners in the ownership of all oil and gas leases then in the name of C. M. Joiner, Trustee, in all leases originally taken in the name of Citizens Lease Syndicate, but controlled by Joiner, Trustee, *in all other leases and royalties to be acquired,* and in all oil and gas wells to be drilled.

On March 30, 1927, W. D. Tucker assigned one-half of his one-fourth interest in the partnership thus created to Sam Warren, Trustee for *G. P. Birdwell* and

other named parties. This assignment was attached as an addendum to the original partnership agreement between Joiner and Tucker referred to above; and the two documents thus attached were filed for record on August 19, 1930, and were recorded as one instrument. Both instruments (omitting acknowledgments) are copied in the margin.[1]

The assignment from Tucker to Warren, Trustee, was acknowledged by Tucker before *G. P. Birdwell*, notary public, who was, of course, disqualified by reason of interest to take the acknowledgment. 1

Tex.Jur. pp. 442–445, secs. 32, 33, 34, 36. But the instrument was valid as between the parties without the acknowledgment. 1 Tex.Jur. p. 417, sec. 8.

■ This instrument plainly gave Birdwell a beneficial interest in all the property which had been assigned to Tucker by Joiner, Trustee, and an interest in all oil and gas leases to be thereafter acquired for the use and benefit of the Joiner-Tucker partnership, as well as in all oil wells, etc.

Tucker, in carrying out his part of the Joiner-Tucker agreement to procure as

---

[1] "State of Texas, } No. 3719.
"County of Rusk }

"For and in consideration of the sum of One Thousand Dollars ($1,000.00) to me in hand paid, the receipt of which is hereby duly acknowledged, I, C. M. Joiner, Trustee, have this day and do by these presents sell and assign a one-fourth undivided interest in and to all the oil and gas leases now owned and controlled by me as Trustee in Rusk County, Texas, and all leases and royalties to be secured and taken in my name as Trustee in said county, the amount heretofore secured amounting to five thousand or more acres, the said above leases are unincumbered and it is the intention of this conveyance to assign a one-fourth undivided interest in all the above mentioned leases to W. D. Tucker of Overton, Texas, and for the above consideration, the said W. D. Tucker is to hold a one-fourth undivided interest in and to all the oil and gas leases and royalty taken in name of C. M. Joiner, as Trustee, Also a one-fourth undivided interest in and to all oil and gas wells to be drilled on said property as the entire interest to be retained in any drilling contract that may be made as the amount retained by said Trustee in the promoting of the drilling of same is to the entire amount retained by said Trustee, giving the assignee hereto a one-fourth undivided interest thereto.

"In addition to the above there are a number of the leases in the vicinity of above leases, originally taken in the name of Citizens' Lease Syndicate, which is now controlled by the assignor, it is expressly understood and agreed that the said Assignor and Assignee are to procure new leases on as many of the leases as possible, which are to be held as above set out, giving to the assignee an undivided one-fourth interest in and to all of said leases.

"In getting renewals on the Citizen's Lease Syndicate leases there will be found a few ten acre 'blocks that are now owned by outside parties, which the records will disclose. These interests, the very small (Not more than 200 acres) should be protected, none of them are near where we will put down first test well.

"It is understood and agreed by the parties hereto that seven hundred ($700.00) of the one thousand mentioned in the above consideration is to be deposited in the FIRST STATE BANK OF OVERTON to be used in securing additional leases and royalty to be taken in name of C. M. Joiner, trustee and in recording the ones we now have and getting an ownership map of our holdings, tracings and blue prints covering East Texas Oil fields showing their relation to our property.

"The assignor and assignee each mutually agree to use their best endeavor to increase our holdings and handle them to best advantage, and all expenses thereto to be paid out of the first proceeds derived from sale of any property jointly owned by assignor and assignee.

"It is expressly understood and agreed that in the deposition of any of the property, it must be done with the consent of both parties hereto.

"As soon as our block is completed, the first money received should be used in getting timbers on the ground to build a derrick, as this will greatly help us in getting money to promote a test well.

"It is further expressly understood and agreed that the assignee, W. D. Tucker, is to keep all records, showing a complete list of our holdings, receipts and disbursements.

"In testimony whereof I hereunto set my hand this the 29th day of March, A. D. 1927.
　　　"W. D. Tucker, Assignee,
　　　"C. M. Joiner, Trustee, Assignor."
(Acknowledgment omitted.)

many leases as possible in the name of C. M. Joiner, Trustee, on April 7, 1927, obtained the lease here involved from the Turners, which was acknowledged by both Mr. and Mrs. Turner before *G. P. Birdwell* as notary, who, being *beneficially interested in the lease*, was disqualified to take the acknowledgments. 1 Tex.Jur. p. 442, sec. 32, p. 443, sec. 33, p. 444, sec. 34, p. 446, sec. 36; 1 Am.Jur., p. 334, sec. 52; 1 C.J.S., Acknowledgments, page 824, §§ 53, 53d; 1 Corpus Juris, p. 802, sec. 110.

The knowledge of Tucker, partner of Joiner, and agent of the partnership, of Birdwell's disqualification was notice to Joiner and the partnership of such disqualification. Gary v. McKinney, Tex. Civ.App., 239 S.W. 283.

The acknowledgment of Mrs. Turner having been taken by Birdwell, a disqualified notary, was absolutely null and void, "is as though it had never been written, is mere waste paper, is not her act and deed, and is wholly ineffectual to divest her of her title." 1 Tex.Jur. pp. 517, 519, secs. 114, 115, 116, p. 535, sec. 133; 22 Tex.Jur. p. 122, sec. 86; Workman's Mutual Aid Ass'n v. Monroe, Tex.Civ.App., 53 S.W. 1029, writ refused; Bexar Building & Loan Ass'n v. Heady, 21 Tex.Civ. App. 154; 50 S.W. 1079, 1080, writ refused; Id., 21 Tex.Civ.App. 154, 57 S.W. 583; Miles v. Kelley, Tex.Civ.App., 40 S. W. 599, 602; Silcock v. Baker, 25 Tex.Civ. App. 508, 61 S.W. 939, 940; Rothschild v. Daugher, 85 Tex. 332, 20 S.W. 142, 16 L. R.A. 719, 34 Am.St.Rep. 811.

This rule applies to oil and gas leases the same as it does to other conveyances of the homestead property. 22 Tex.Jur. p. 128, sec. 90; 31 Tex.Jur. p. 587, sec. 44.

It is unnecessary to decide the effect of this void deed in the hands of an innocent purchaser (as was done in Workman's Mutual Aid Ass'n v. Monroe, supra), since we have concluded defendants in error are not of that class.

The defendants in error say that, since their title comes through C. M. Joiner, Trustee, the intervening instruments which disclose Birdwell's disqualification to take the Turner acknowledgments do not convey notice to them, because "not in" their "chain of title"; and that they are not charged with notice of any infirmities in the acknowledgments, because of Revised Statutes, Article 7425a.

The two rules invoked have no application here.

The general rule as to notice to a purchaser of realty is stated in 43 Texas Jurisprudence, p. 647, sec. 383, as follows:

"It is a general rule that the purchaser is charged with notice of the existence, contents, and legal effects of all instruments contained in his chain of title or connected therewith. *He is bound by every description, recital, reference and reservation, and by every other matter contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims. This is so regardless of whether the instrument is recorded or whether he has actually seen or read it, or has any knowledge of its contents.*

"*Accordingly, the purchaser is charged with knowledge of any equity or interest of a third person which is disclosed or recognized by a conveyance through which he claims, as well as notice of any fact recited or revealed in such conveyance, in the certificate of acknowledgment, or in another instrument to which the conveyance refers.* And when a fact is recited which is sufficient to put a prudent man on inquiry, the purchaser is charged with notice of facts which might have been ascertained by a proper inquiry." (Italics ours.)

See, also, 31 Tex.Jur. pp. 376–378, sec. 11; 20 R.C.L. p. 353, sec. 15; 27 R.C.L., p. 715, sec. 481; authorities post.

In the instant case, the title of defendants in error comes by mesne conveyances through C. M. Joiner, Trustee. The addition of the word *"Trustee"* to Joiner's name was sufficient to convey notice that Joiner was but a trustee, and put defendants in error upon inquiry as to the character of trust under which he acted, and the extent and limitations of his authority. 20 R.C.L. p. 354, sec. 15; 42 Tex. Jur. p. 732, sec. 116, p. 733, sec. 117; Stone v. Kahle, 22 Tex.Civ.App. 185, 54 S.W. 375, 377; Carleton v. Roberts, 1 Posey Unrep. Cas. pages 587, 594; Merriman v. Russell, 39 Tex. 278, 284; Mercantile National Bank v. Parsons, 54 Minn. 56, 55 N.W. 825, 40 Am.St.Rep. 299; Kennell v. Herbert, 342 Ill. 464, 174 N.E. 558; Shaw v. Spencer, 100 Mass. 382, 389, 97 Am.Dec. 107, 1 Am.Rep. 115; Welles v. Larrabee, C.C., 36 F. 866, 870, 2 L.R.A.

471; Johnson v. Calnan, 19 Colo. 168, 34 P. 905, 908, 41 Am.St.Rep. 224; Marbury v. Ehlen, 72 Md. 206, 19 A. 648, 20 Am.St. Rep. 467; Fisher v. Brown, 104 Mass. 259, 6 Am.Rep. 235; Loring v. Salisbury, 125 Mass. 138.

■ As stated above, on the 29th day of March, 1927, C. M. Joiner, Trustee, and one W. D. Tucker entered into an agreement, which is copied in the margin.

*By this instrument, it is obvious that Joiner, Trustee, assigned a one-fourth interest in all the leases which he then owned and all to be thereafter acquired in the name of Joiner, Trustee, to Tucker for the $1000, etc.* The agreement states that both Joiner, Trustee, and Tucker "mutually agree to use their best endeavor to increase our holdings and handle them to best advantage, * * *." It further provides that "all expenses thereto to be paid out of the first proceeds derived from sale of any property jointly owned by assignor and assignee." The instrument goes into some detail in regard to the method of operation, not necessary to be stated here.

It is perfectly clear from this agreement that it created a joint working, as well as a joint ownership, partnership between Joiner and Tucker for the purpose of engaging in the business of obtaining leases and producing oil and gas. 32 Tex.Jur. p. 215, sec. 21, pp. 217, 218, sec. 2, p. 227, sec. 8, p. 244, sec. 20.

For these reasons, it was a *mining partnership*. 29 Tex.Jur. p. 698, sec. 32; Summers on Oil & Gas, Permanent Edition, volume 4, §§ 722–724; Munsey v. Mills & Garitty, 115 Tex. 469, 283 S.W. 754; Wagner Supply Co. v. Bateman, 118 Tex. 498, 18 S.W.2d 1052.

■ All the property of the partnership at the time of its creation stood in the name of Joiner, Trustee, or was owned and controlled by him; but his agreement to hold it for the use and benefit of the partnership was sufficient to create a trust. 26 R.C.L. p. 1182, sec. 19.

■ All leases to be acquired after the creation of the partnership were to be taken in the name of "C. M. Joiner, Trustee," but were to be partnership property. This, of course, created a trust. 42 Tex. Jur. p. 668, sec. 60; 47 C.J. pp. 757, 758, sec. 190.

■ In the instrument itself, however, Joiner is named as *"trustee"* in conformity with the legal effect of the agreement.

In fact, it may be said that the partnership agreement between Joiner, Trustee, and Tucker not only named Joiner as Trustee, but declared the terms and purposes of the trust, and by its registration notice was given to all the world that the property comprised was held under the terms of the agreement; and subsequent purchasers could not claim that they took in ignorance of the trust. 42 Tex.Jur. p. 733, sec. 117; Merriman v. Russell, 39 Tex. 278.

The partnership agreement between Joiner, Trustee, and Tucker was executed on March 29, 1927. One of the additional leases which was secured in the interest of the partnership was that from the Turners to Joiner, Trustee, *the identical lease involved in this suit*, secured on April 7, 1927. Obviously, under the facts, this lease is within the terms of the working partnership agreement, and Tucker took title to a one-fourth interest therein.

■■ The statute invoked (R.S., Art. 7425a Vernon's Ann.Civ.St. art. 7425a), as giving Joiner, Trustee, plenary power to convey the property of the partnership trust, clearly has no application. The statute in part declares: "Where a trust is created, but is not contained or declared in the conveyance to the trustee, * * *."

Here the Joiner-Tucker agreement declares the trust and defines and limits the powers of the trustee. In such case the rule is that the trustee must strictly follow the prescribed mode of exercising his powers. 42 Tex.Jur. p. 718, sec. 104, p. 714, sec. 99; Ryan v. Porter, 61 Tex. 106; Bowman v. Oakley, Tex.Civ.App., 212 S. W. 549, writ refused; Haldeman v. Openheimer, 103 Tex. 275, 126 S.W. 566; Wisdom v. Wilson, 59 Tex.Civ.App. 593, 127 S.W. 1128, 1135, writ refused; Kennedy v. Pearson, Tex.Civ.App., 109 S.W. 280, 283, writ refused.

The agreement of Joiner, Trustee, and Tucker in part declares: "It is expressly understood and agreed that in the disposition of any of the property, it must be done with the consent of both parties thereto."

■ It is obvious that the word "deposition" used in the quotation, and in the instrument as copied in the statement of facts, is a typographical error for the word "disposition," and we are so treating it. The provision is consistent with the general rule of law that one partner has no implied authority to sell or convey the firm's real estate, but may with the consent

of the other partner convey partnership land. 32 Tex.Jur. p. 290, sec. 44, p. 366, sec. 75; Theis v. Curts, Tex.Civ.App., 33 S.W.2d 754, 758; Slayden & Co. v. Palmo, 53 Tex.Civ.App. 227, 117 S.W. 1054, 1057; Williams v. Meyer, Tex.Civ.App., 64 S.W. 66, 69, writ refused; ·20 R.C.L., p. 905, sec. 116; 47 Corpus Juris, p. 854, sec. 323.

The effect of this clause in the instrument was to prevent Joiner, Trustee, from exercising the power to convey under the statute (art. 7425a)· invoked to support such authority in this case.

It is plain that Joiner, Trustee, could not sell the Joiner-Tucker property either as trustee or partner without Tucker's consent. 42 Tex.Jur. p. 718, sec. 104; 32 Tex.Jur. p. 335, sec. 75; authorities supra. But Tucker could not consent, because he had conveyed one-half of his one-fourth interest to Warren, Trustee, for Birdwell and others,[2] by virtue of which, under the law applicable to mining parnerships, Warren, Trustee, had become a partner with Joiner, Trustee, and Tucker in the enterprise. Summers on Oil and Gas, Permanent Edition, volume 4, § 725; Indiahoma Refining Co. v. Wood, Tex.Civ. App., 255 S.W. 212, 214; Munsey v. Mills & Garitty, 115 Tex. 469, 484, 283 S.W. 754.

In order that sales of leases might be consummated by Joiner, Trustee, all the interested parties, including Tucker, executed conveyances sufficient. to place the whole title in Joiner, Trustee, *and to evidence their consent to sales,* before Joiner, Trustee, ever undertook to convey the lease to those through whom defendants in error claim title. For this purpose they executed two instruments, one of which conveyed the title and interests of Tucker and of Sam Warren, as trustee, to Joiner, Trustee; · the other ratified Warren's conveyance, and conveyed the title of those for whose benefit Sam Warren was trustee to Joiner. The first instrument or assignment,—that executed by W. D. Tucker and Sam Warren on the 12th day of Sep-

tember, 1930,—was properly acknowledged and duly filed for record on the same date. It reads in part as follows:

"Assignment of Oil· and Gas Lease.

"Whereas, on the 29th day of March, 1927, a certain agreement or assignment was made and entered into by and between C. M. Joiner, Trustee, and W. D. Tucker, said instrument being of record in Volume 148 pages 456-7 Deed Records Rusk County, Texas, and whereas, on the 30th day of March, 1927 W. D. Tucker for a valuable consideration assigned a one-half interest in and to said agreement or assignment to Sam Warren, trustee for the following, towit:

| | | | |
|---|---|---|---|
| "J. H. Silvey | $ 50.00 | Walker Wilson | $500.00 |
| "Sam Warren | 50.00 | V. E. Minor | 100.00 |
| "W. E. Florey | 50.00 | *G. P. Birdwell* | *100.00* |
| "McGuerin | 100.00 | Lee Gipson | 50.00 |

as their interests appear, the said last assignment to said Sam Warren, Trustee, by W. D. Tucker, being attached to the original agreement or assignment above referred to *and reference is here made to the original instrument with the addenda assignment and the records of same for all purposes, especially for a description of* the property herein conveyed; * * *."

The instrument then recites the assignment of a one-fourth interest in the Joiner, Trustee, leases, properties, etc., covered by the original partnership and trust agreement between Joiner, Trustee, and Tucker heretofore described, and all leases and royalties to be acquired thereunder,—in fact, describing fully the contents of the Joiner-Tucker partnership agreement; and states that the "undersigned" (Tucker and Warren, Trustee) are the owners of one-fourth undivided interest in and to all leases, royalties, rights, titles, and equities set forth in the original agreement between Joiner, Trustee, and Tucker. The instrument then, upon a named consideration conveys the property to "C. M. Joiner, Trustee, and *his heirs, successors, and assigns.*" They also "covenant with the said assignee, *his heirs, successors or assigns, that the undersigned are the lawful*

2 "State of Texas, "County of Rusk

"For a valuable consideration to me in hand paid, the receipt of which is hereby acknowledged, I, W. D. Tucker, hereby assign a one-half interest in and to the attached assignment to Sam Warren, Trustee for

| | | | |
|---|---|---|---|
| "J. H. Silvey | $ 50.00 | ·V. E. Minor | $100.00 |
| "Sam Warren | 50.00 | G. P. Birdwell | 100.00 |
| "Mrs. W. E. Florey | 50.00 | McDeguerin | 100.00 |
| | | Lee Gipson | 500.00 |
| "Walker Wilson | 500.00 | | |

as their interest appears.

"Witness my hand this the 30th day· of March A. D. 1927.

"W. D. Tucker."

(Acknowledgment omitted.)

*owners of said property above mentioned* and rights and interests thereunder; that the undersigned *have good right and authority to sell and convey* the same, * * *."

"Executed this the 12 day of September, A. D. 1930.

"W. D. Tucker Sam Warren." (All italics ours.)

The second instrument, signed and acknowledged by Birdwell and others, beneficiaries under the Sam Warren, Trustee, assignment from Tucker, was executed and filed for record on October 1, 1930. The first two paragraphs of this instrument are the same as those quoted above in the conveyance from Tucker and Warren to Joiner, Trustee.

The conveyance then recites the execution of the instrument just above described, and declares that Sam Warren had "full right, power and authority as our Trustee to execute said instrument," and ratifies and confirms the conveyance of Warren, Trustee, to Joiner described above.

The instrument then declares that the grantors "do hereby bargain, *sell, transfer, assign and convey* all rights title or interest in and to all of the said property hereinabove referred to, * * * to C. M. Joiner, Trustee, and his *heirs, principals, successors and assigns.*

"To have and to hold the above described premises together with all and singular the rights and appurtenances thereto in anywise belonging unto the said C. M. Joiner, Trustee his *heirs principals, successors and assigns,* forever, *and we do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said C. M. Joiner, Trustee, his heirs, principals, successors and assigns against every person whomsoever, lawfully claiming or to claim the same or any part thereof, by through.or under us.*

"Executed this the 1st day of October, A. D. 1930.

"G. P. Birdwell, Walker Wilson,
"W. E. Florey, V. E. Minor,
"Bernice Florey, Lee Gipson,
"M. C. DeGuerin, Sam Warren."
"J. H. Silvey, (All italics ours.)

The above-described instruments were both executed and filed for record long before Joiner, Trustee, executed the conveyances through which the defendants in er-

ror claim, one of which, to H. L. Hunt, Trustee, was executed November 26, 1930, filed for record December 1, 1930, and the other to W. D. Tucker and D. F. Cameron was executed March 20, 1931, and filed for record on the day of its execution.

Each of the above-described conveyances to Joiner, Trustee, refers to and gives complete descriptions of the original agreement between Joiner, Trustee, and Tucker, and of the assignment from Tucker to Sam Warren, Trustee for Birdwell and others. In fact, the originals of said instruments, and their recordation, are referred to "for all purposes." *Each shows the names of the beneficiaries for whom Warren is made trustee in the assignment from Tucker to Warren, Trustee, including G. P. Birdwell.* Each conveys the title of the grantors to C. M. Joiner, Trustee, the conveyances in each running to *"C. M. Joiner, Trustee, and his heirs, successors and assigns."* This language is repeated in various clauses italicized above in the two instruments, including a special covenant of ownership and right to convey in one, and habendum and special warranty clauses in the other.

█ The parties to these two instruments, by using the words or phrases quoted, and those italicized as stated, by which the grants were made to Joiner, Trustee, *"his heirs and assigns, * * * his heirs, successors and assigns,"* or warranties or covenants made in the same, as well as in the "To have and to hold" (habendum) clause in the last conveyance above described, to Joiner, Trustee, *"his heirs, principals, successors and assigns,"* by use of the word *"assigns"* necessarily import an unrestricted right on the part of Joiner, Trustee, to assign the properties conveyed. Penick v. Eddleman, Tex.Com.App., 291 S.W. 194, 195; Johnson v. Morton, 28 Tex.Civ.App. 296, 67 S.W. 790, 791, writ refused.

█ In fact, these conveyances in placing the whole title in Joiner, Trustee, effectuated a merger of the legal and equitable estates by a surrender on the part of the beneficiaries of all their rights to the trustee, and thus terminated the trust, giving Joiner an unrestricted right to convey. 26 R.C.L., p. 1211, sec. 53. These two instruments are necessarily in defendants in error's chain of title, for the reason that but for them Joiner, under the terms of the partnership and trust agreement, as well as the general law of partnership, would have had no authority to execute the conveyances

under which the defendants in error claim title to the property in controversy.

The effect of the above-described conveyances to Joiner, Trustee, *was to put defendants in error upon notice that G. P. Birdwell owned a beneficial interest in the property acquired, and to be acquired, under the Joiner-Tucker partnership.* Authorities supra. *Moreover, they show that Tucker conveyed one-half of his one-fourth interest with Joiner to Warren, Trustee, for named beneficiaries, including G. P. Birdwell, on the 30th day of March, 1927, which was prior to the date that Birdwell took the acknowledgments of Mr. and Mrs. Turner to the lease in controversy in this case; and show beyond the possibility of controversy that Birdwell was disqualified to take the Turner acknowledgments.*

It will be noted that both these conveyances not only give the facts as to the assignment by Tucker of one-half of his one-fourth interest in the Joiner, Trustee, leases to Sam Warren, Trustee for certain named parties, including *G. P. Birdwell,* but make particular reference to the assignment, and state that the same is attached to the original partnership and trust agreement between Joiner and Tucker, and (quoting) "reference is here made to the original instrument with the addenda (addendum) assignment, and the records of same for all purposes." This, of course, had the effect of making the Joiner-Tucker agreement, by which Tucker acquired a one-fourth interest in the Joiner properties, and the Tucker-Warren assignment, in which the interest of Birdwell and other beneficiaries is disclosed, part of each of these instruments, irrespective of the question of the validity of the acknowledgment to the Tucker-Warren assignment, and as to whether or not it should have been filed for record. 10 Tex. Jur. p. 288, sec. 167; Smith v. City of Navasota, 72 Tex. 422, 427, 10 S.W. 414; 31 Tex. Jur. p. 376, sec. 11; 43 Tex.Jur. p. 647, sec. 383, pp. 651, 653, sec. 384; 36 Tex. Jur. p. 506, sec. 64; Simmons v. Johnson, 14 Wis. 523, 526, 527; Jarstadt v. Morgan, 48 Wis. 245, 4 N.W. 27–29; Fleischfresser v. Schmidt, 41 Wis. 223, 227; 23 R.C.L. p. 256, sec. 124; 20 R.C.L. p. 353, sec. 15; Davidson v. Ryle, 103 Tex. 209, 217, 124 S.W. 616; Waggoner v. Dodson, 96 Tex. 415, 420, 421, 73 S.W. 517; Blagge v. Moore, 6 Tex.Civ. App. 359, 23 S.W. 466, 472; Harris v. Masterson, 91 Tex. 171, 177, 41 S.W. 482; Golson v. Fielder, 2 Tex.Civ.App. 400, 21 S.W. 173, 174; Texas Co. v. Dunlap, Tex.

Com.App., 41 S.W.2d 42, 44; Garrett v. Parker, Tex.Civ.App., 39 S.W. 147, writ refused; Green v. Hugo, 81 Tex. 452, 457, 17 S.W. 79, 26 Am.St.Rep. 824; Smith v. Estill, 87 Tex. 264, 269, 28 S.W. 801; Carter & Bro. v. Davis, Tex.Civ.App., 88 S.W. 2d 596, 601; Yates v. Buffalo State Bank, Tex.Civ.App., 229 S.W. 619, 622; Moore v. Scott, Tex.Civ.App., 38 S.W. 394; Hexter v. Pratt, Tex.Com.App., 10 S.W.2d 692, 694; Spiller v. Bell, Tex.Civ.App., 55 S.W.2d 634, 636; Hill v. Stampfli, Tex.Com.App., 290 S.W. 522, 525; City of Dallas v. Rutledge, Tex.Civ.App., 258 S.W. 534, 539.

The defendants in error not only claim title under the lease as originally acknowledged before Birdwell, but as *reacknowledged by Turner and wife on October 18, 1930,* before James A. Copeland, a notary public in and for Harris County, and which was again filed and recorded. The lease as last recorded was, and is, exactly the same as it was when recorded the first time, except it had been *again acknowledged by the lessors, Turner and wife, before a qualified notary.* That was the only change or addition made.

Since the first acknowledgments were in statutory form, the fact of re-acknowledgment under the circumstances points unmistakably to the real reason for the re-acknowledgment and re-recordation, —namely, some *latent* defect in the first acknowledgment, and was sufficient to put defendants in error upon inquiry, which, had it been pursued, would have led to knowledge of Birdwell's disqualification to take the Turner acknowledgments, and the consequent invalidity of the Turner lease. 31 Tex.Jur., pp. 362, 365, secs. 4, 5; 46 C. J., pp. 543, 547, secs. 29, 30.

An acknowledgment is a part of an instrument, and facts disclosed by it have the same effect as notice as if they appeared in the body thereof. 36 Tex.Jur. p. 499, sec. 61; Griggs v. Houston Oil Co., Tex.Com.App., 213 S.W. 261; Green v. Hugo, 81 Tex. 452, 457, 17 S.W. 79, 26 Am. St.Rep. 824.

No jury finding that Birdwell was disqualified was necessary. His disqualification was apparent from the record, exists as a matter of law; and defendants in error are charged with notice thereof. There was no evidence that there were two G. P. Birdwells in Rusk County, where these transactions took place, and the record shows that G. P. Birdwell had acted as

a notary for the Joiner-Tucker interests in the other instance.

██ In the absence of evidence to the contrary, we must presume that *G. P. Birdwell,* the *notary,* was the same *G. P. Birdwell* who was a beneficiary in the Tucker-Warren assignment. Under the facts before us, "proof of identity or similarity of name will suffice." 30 Tex.Jur. p. 597, sec. 13; 22 C.J., p. 92, sec. 32; Chamberlayne's Hand Book on Evidence, p. 339, sec. 488; 15 Am. & Eng. Ency. of Law, 2d ed., pp. 918, 920, sec. 8; Stebbins v. Duncan, 108 U.S. 32, 2 S.Ct. 313, 27 L.Ed. 641, 647; Chamblee v. Tarbox, 27 Tex. 139, 140, 144, 84 Am.Dec. 614; Robertson v. DuBose, 76 Tex. 1, 6, 13 S.W. 300; Smith v. Gillum, 80 Tex. 120, 125, 15 S.W. 794; Leland v. Eckert, 81 Tex. 226, 229, 16 S.W. 897; Lemberg & Allen v. Cabanis, 75 Tex. 228, 12 S.W. 844; Jester v. Steiner, 86 Tex. 415, 419, 25 S.W. 411; Clark v. Groce, 16 Tex. Civ.App. 453, 41 S.W. 668; Blunt v. Houston Oil Co., Tex.Civ.App., 146 S.W. 248, 251, writ refused; Hill & Jahns v. Lofton, Tex.Civ.App., 165 S.W. 67, 70, writ refused; Batcheller v. Besancon, 19 Tex.Civ. App. 137, 47 S.W. 296, 299, writ refused; Lee v. Murphy, 119 Cal. 364, 51 P. 549, 955. In the case last cited, the Supreme Court of California held: "An acknowledgment of a mortgage made before a notary public bearing the same identical name with that of the mortgagee, and made in the county of the residence of both parties, must be presumed, from the identity of name, to have been taken before the mortgagee as a notary public, in the absence of proof to the contrary; * * *."

██ The lease executed by Mr. and Mrs. Turner to C. M. Joiner, Trustee, being void as to the homestead, conveyed no title; and defendants in error, who claim under and through Joiner, Trustee, being charged with knowledge of its invalidity, cannot recover. 41 Tex.Jur. p. 486, sec. 27.

On July 25, 1930, long before the execution of the conveyance from Joiner, Trustee, through which defendants in error claim title, G. G. Turner and wife executed an oil and gas lease on the property here involved to J. W. Pevey. The lease was properly acknowledged by both lessors on August 2, 1930, filed for record in Rusk County on August 5th, and duly recorded on August 8, 1930. It is through this conveyance that the plaintiff in error, Gulf Production Company, claims.

Against the conclusion that this instrument is valid and effective, defendants in error urge the proposition that in May or June, 1930, prior to the execution of the Pevey lease on August 2, 1930, the Turners had abandoned their homestead, and that by reason thereof the Joiner lease became effective as a conveyance by Turner of the property.

██ The jury found that Turner and wife, prior to August 2, 1930, "moved away from the land in controversy with no intention of returning and occupying same as their homestead." In view of the law that an abandonment of the homestead is not accomplished by going away without any intention to return at any particular time, but by going away *"with the definite intention never to return at all";* and in view of the rule that the homestead claimant may leave the homestead because 'of the illness of himself or family, and for many other reasons or purposes, including that of acquiring means to improve the homestead, or for the subsistence of his family, or he may leave with the intent "to abandon provided he can sell," without an abandonment of his present homestead, it may well be doubted if this finding is sufficient to constitute a legal abandonment of the homestead. 22 Tex.Jur. pp. 71, 72, sec. 46; Foreman v. Meroney, 62 Tex. 723, 727; Sheperd v. Cassiday, 20 Tex. at pages 24, 30, 70 Am.Dec. 372, and authorities post. Be that as it may, however, there is not a scintilla of evidence in this record to support the jury's finding. On the contrary, *all* the evidence shows that when the Turners left the premises in controversy in May or June, 1930, they left for a short visit to their daughter in Houston, the immediate occasion being a "stroke" suffered by Mrs. Turner; because of which, and Mr. Turner's feeble condition, they were unable to care for themselves.

No oil had been discovered in Rusk County or the East Texas oil field at that time; and the same situation existed on July 25 and August 2, 1930, when they executed the Pevey lease.

G. G. Turner, the plaintiff in error, testified by depositions (taken apparently in 1931) that he was taken ill upon his·place (the land in controversy) in May (1930); that he worked some after he was unable to work, but had not been able to work to amount to anything since that time. *He stated that his illness was the occasion for*

*leaving the farm and moving to Houston, because he was not able to work. Refer-ring to the place here involved, the witness testified: That it was his home during all that time; that he was living there in 1927, and that it was still his home.* That now he was just living around with his children. He further said that it was the only home he was going to keep, and that if anything happened to any of his children, or if they ever "got oil out of that country" he was going back; that it was the only home he had.

Mrs. G. G. Turner testified by depositions (taken apparently in 1931) that she lived in Houston with her daughter, Mrs. Love, and her son-in-law; that she lived with them, in Palestine, until they moved to Houston; that she moved from her old home (in Rusk County) in June, 1930; that the property in controversy *"is still our home. It will be until our death I reckon";* that it was the only home they had; that she was now just living with her children; and that she did not intend to sell their home as long as she lived.

John W. Turner, a son of the plaintiffs in error, Mr. and Mrs. Turner, *who assisted Cameron, Joiner's agent, in obtaining a re-acknowledgment of the Turner-Joiner lease,* to be later referred to, was called as a witness by the defendants in error, and testified: That his father and mother went to Houston in May or June, 1930; that they were 77 years of age at the time; that his mother *"suffered a stroke"* just before they went; that his father's health at the time, and the general strength of his parents, *"was feeble";* and that all his brothers and sisters had previously married, and all *"left home,"* except one of the boys who lived on the place, but not in the house with his father and mother. In answer to the question as to why his father and mother left home and went to Houston, he said: *"It was on account of mother's sickness, she had a stroke and got to where she was not able to wait on herself."* (Italics ours.)

John Talley, testifying upon the trial of the case in March, 1932, stated that he was the son-in-law of Mr. and Mrs. Turner, his wife being their daughter, Eunice (de-ceased at the time the evidence was being given); that in June, 1930, his father-in-law came to Houston, not to live, but to pay a visit; and that he came to stay two weeks. He said: *"To be exact he wrote me a let-ter and told me that he was coming to spend two weeks with me";* that Mr. and

Mrs. Turner came as far as Palestine to-gether from the old place, but Mrs. Turner stopped in Palestine, "because she was not able to make the trip," and Mr. Turner came on to the witness' house at Houston.

The witness' wife died in August (1931), and one of the Turner boys, Emmett, took Mr. Turner back to his (Emmett's) home at Arp; and that Mr. Turner had been at the old place and back to Houston visiting, first one place and then another, among his children.

The witness said: *"My father-in-law and mother-in-law, they got to where they were not able to stay in the old home and look after themselves after Mrs. Turner had her little stroke. * * * Mr. Tur-ner did not come to live with me. He came to pay me a visit, and Mrs. Turner's health had been bad and is yet to where we thought it was not safe for them to go back to their home."*

This witness testified that Mr. and Mrs. Turner's home was the old homestead; that they claimed the old home as their homestead; that they still have all of their personal belongings in their old home, in-cluding their household furnishings, live-stock, and chickens; that they have always called it home and always will; in fact it is their home; and that Mrs. Turner had been back to the old place to visit Dake, a son, who lived there, two or three times since she left it in June, 1930. (All italics ours.)

Emmett Turner, a son of Mr. and Mrs. Turner, testified that his father and mother claimed the land in controversy as their homestead; that they would both love to live at the old home place if they could; that his father has told him that no telling how many times; that his father had asked him to take him back to the old home sev-eral times, and he had carried him back there five or six times in the last six months; that he spends all the way from a week to a month when he goes back; and that he spent two weeks there the pre-ceding January, and a month "up until a few days ago."

It is true that Mr. Turner, testifying (by deposition) in 1931, *after oil wells had been brought in on his place,* stated there were oil wells on the place then, and he did not think he would make it his home any more; that he had no intention of going back there; and that he might go up there, but he could not live there any more. This evi-

dence was given in view of the condition of things at the old home place at the time the witness was testifying, but even then was qualified by the statement, *that if anything happened to his children, or if they got oil out of that country, he would go back.* In connection with this qualifying statement, the testimony shows that after the death of Mrs. Talley, his daughter, (in August, 1931) with whom he was staying in Houston, *he did go back, and has been back many times, staying sometimes as long as a month at the old home place, where his household goods and belongings were.* Mrs. Turner, also testifying (by depositions in 1931), *after the oil wells came in,* said it would be impossible for them to go back to the old home to live; *that Mr. Turner's health was failing faster and faster.* But this in turn is qualified by her further statements that the property here in controversy was the only home they had; that now they were just living with their children; but that they had no other home, and did not intend to sell it as long as they were living.

This testimony of Mr. and Mrs. Turner relates only to the conditions existing, and their own state of mind, approximately a year after they went to Houston, long after the conveyance to Pevey, and does not in the remotest degree refer to the conditions at the time of the execution of the Pevey lease, or their *intentions* when they left their home for the visit to Houston in June, 1930.

In addition to the foregoing testimony, we also note that in the Pevey lease the use of the water wells on the premises was reserved from the grant; that pipe lines were required to be buried below plow depth; that the lessee was prohibited from drilling oil wells nearer than 200 feet of the house or barns on the premises, without the written consent of the lessors; and that the lessee should pay for damages caused by oil operations to growing crops. These reservations, or provisions, plainly evidenced the intentions of the lessors to continue to occupy and use the premises for the usual farm and residential purposes.

In addition to the above, we direct attention to the fact that the undisputed evidence shows that at all times, from the day they left home in June, 1930, up to the time of the trial in March, 1932, Mr. and Mrs. Turner used the old home in the only way their age and state of health permitted them to use it. They kept all their household goods and effects there, visited the place from time to time, Mr. Turner sometimes staying a month at a time; and we assume they enjoyed the rents and revenues from the home, because nothing appears to the contrary. Under such circumstances, there is no abandonment of the homestead. Foreman v. Meroney, 62 Tex. 723, 727; Rawleigh Co. v. Blackwell, Tex.Civ.App., 48 S.W.2d 754; and authorities post.

There is not a line in the record which shows the Turners had any intention of abandoning their homestead from the time they left home, in June, 1930, to the date of the execution of the Pevey lease. *They left because they were ill and feeble, the undisputed evidence showing, for a temporary visit. It is true Mrs. Turner's illness from her "stroke" was prolonged some two or three months before she reached Houston, but every moment of her absence, as well as the absence of Mr. Turner, up until the execution of the Pevey lease, was due to the illness or feebleness of one or the other, or of both. There is nothing in the remotest degree that up to that time they had the intention not to return to the old homestead when they could.*

The defendants in error, in their brief filed in the Court of Civil Appeals, summarize the evidence as to the occasion and reason for Mr. and Mrs. Turner's trip to Houston as follows: "The facts show that in 1930 Mr. and Mrs. Turner were seventy-seven years old. They were feeble from their advanced years. Mr. Turner was no longer physically able to work. Mrs. Turner's feebleness had brought on a stroke. Their children had married and moved away from the old home and had become scattered. Mrs. Talley, a daughter, had moved to Houston; Mrs. Love, another daughter, was living in Palestine; John and Emmet, sons, had acquired farms of their own, and Dake, another son, was living in a separate house on the old Turner place."

Defendants in error then say, arguendo: "Feeble and in their advanced years, these old people knew that they could no longer live alone on the farm. They would of necessity have to spend their few declining years in the care of their children."

It thus appears that there is a unanimity of conclusion from the evidence that Mr. and Mrs. Turner went to Houston because of illness, and because of their aged and feeble condition—that in no sense did they *voluntarily* leave the old home. The state-

ment in the quotation that "these old people knew that they could no longer live alone on the farm," is purely argument of counsel. There is no evidence of any character as to what "these old people" knew.

The homestead provisions of the Texas Constitution, Vernon's Ann.St. Const. art. 16, § 50 et seq., were intended to be interpreted and administered in a practicable way. They were formulated by able men, well acquainted with the ordinary conditions of life, who knew men and their wives become aged, infirm, feeble, and ill, and that, as the end nears, they must be nursed and cared for by their children— or generally were—and sometimes, as it were, "live around among the children." They also knew that when old age and illness come, the preservation of the homestead, with what shelter and sustenance it offers, is more needed than before. Under the homestead provisions of the Constitution and laws of Texas, aged and sick people do not go at their peril to the homes of their children for aid in their feebleness and distress; these provisions are not so tenuous and frail a shield as that. They were intended to protect the homestead through all the natural vicissitudes of life, including old age, feebleness, and sickness; and during every condition or circumstance that these entail, *unless and until the homestead is voluntarily abandoned.* A temporary absence, due to these or other like causes, or domestic or financial necessities, or the unfitness of the home for use, does not constitute an abandonment; and to this we may add that if Turner and wife left the old home as defendants in error say, because "feeble and in their advanced years these old people knew they could no longer live alone on the farm" and "would of necessity have to spend their few declining years in care of their children," there was no *voluntary* abandonment of the home. An act of *necessity* is not a *voluntary* act, *and there can be no legal abandonment, unless it is voluntary.* 22 Tex. Jur. p. 75, sec. 49, p. 76, sec. 50; 29 C.J., p. 941, sec. 359, p. 939, sec. 356; Sykes v. Speer, Tex.Civ.App., 112 S.W. 422, 426; Rawleigh Co. v. Blackwell, Tex.Civ.App., 48 S.W.2d 754; Flynn v. Hancock, 35 Tex. Civ.App. 395, 80 S.W. 245, 246; Foreman v. Meroney, 62 Tex. 723, 727; Shepherd v. Cassiday, 20 Tex. 24, 30, 70 Am.Dec. 372; Baum v. Williams, 16 Tex.Civ.App. 407, 41 S.W. 840, 841; 29 C.J., pp. 939, 941, secs. 356 to 359, and many illustrative authorities cited in the notes; Rose v. Farmers, etc. Bank, 95 Kan. 331, 148 P. 745; authorities post.

As said by Chief Justice Hemphill in Shepherd v. Cassiday, just cited: "We must remember the wise and beneficent purposes of the homestead exemption; that it was intended to secure the peace, repose, independence, and subsistence of citizens and families; that it was placed beyond the reach of creditors, an asylum upon which they might gaze, but which they could neither enter nor disturb; a right so strongly secured, founded upon such high public policy, cannot be lost by the mere absence of the party or family intended to be benefited. The homestead is not to be regarded as a species of prison bounds, which the owner cannot pass over without pains and penalties. *His necessities or circumstances may frequently require him to leave his homestead for a greater or less period of time. He may leave on visits of business or pleasure; for the education of his children; or to acquire in some more favorable location, means to improve his homestead; or for the subsistence of his family; or he may intend to abandon, provided he can sell. But let him leave for what purpose he may, or be his intentions what they may, provided they are not those of total relinquishment or abandonment, his right to the exemption cannot be regarded as forfeited.*" (Italics ours.)

We quite agree with the opinion of the Commission of Appeals in the case of Foreman v. Meroney, 62 Tex. 723, 727, in which it is said: "*The homestead, therefore, is not to be likened to prison bounds, within which the family must always remain, but to a sanctuary, to which they may always return. And an abandonment is accomplished, not by going away without any intention of returning at any particular time in the future, but by going away with the definite intention never to return at all.*" (Italics ours.)

The authority just quoted states the correct rule. To constitute an abandonment of a homestead, *the claimant must go away with the definite intention not to return; or, we may add, must form such definite intention after going away.* 22 Tex.Jur. pp. 71, 72, sec. 46; Henderson v. Texas M. Plow Co., 109 Tex. 466, 470, 211 S.W. 973; Archibald v. Jacobs, 69 Tex. 248, 251, 6 S.W. 177; Hudgins v. Thompson, 109 Tex. 433, 437, 211 S.W. 586; Dunlap v. English, Tex.Civ.App., 230 S.W. 829,

830; Gouhenant v. Cockrell, 20 Tex. 96; Shepherd v. Cassiday, 20 Tex. 24, 70 Am. Dec. 372; Sanders v. Sheran, 66 Tex. 655, 2 S.W. 804; McKenzie v. Mayer, Tex. Civ.App., 20 S.W.2d 238, 240; Gonzales v. Zachry, Tex.Civ.App., 84 S.W.2d 855, 857, writ refused; Bogart v. Cowboy State Bank, Tex.Civ.App., 182 S.W. 678, 681; Grimes v. Cline, Tex.Civ.App., 300 S.W. 235, 236; Armstrong v. Neville, Tex.Civ. App., 117 S.W. 1010; Clem Lumber Co. v. Elliott Lumber Co., Tex.Com.App., 254 S.W. 935, 938.

█ Moreover, the party asserting the abandonment of a homestead has the burden of proving it *"by evidence undeniably clear and beyond almost the shadow—at least all reasonable ground of dispute."* 22 Tex.Jur. p. 72, sec. 46; 22 Tex.Jur. p. 81, sec. 53, p. 82, sec. 54; Gouhenant v. Cockrell, 20 Tex. 96, 98; Shepherd v. Cassiday, 20 Tex. 24, 29, 70 Am.Dec. 372; Thomas v. Williams & Bonner, 50 Tex. 269, 274; Hudgins v. Thompson, 109 Tex. 433, 437, 211 S.W. 586; Bogart v. Cowboy State Bank, Tex.Civ.App., 182 S.W. 678, 681; Bell v. Franklin, Tex.Civ.App., 230 S.W. 181, 184; Dunlap v. English, Tex.Civ.App., 230 S.W. 829.

█ In the face of these authorities, it is idle to say, under the evidence in this case, that up to the time the Pevey lease was executed it is "undeniably clear, and beyond almost the shadow—at least all reasonable ground of dispute," that the Turners had abandoned their home. There is no evidence whatever to support the jury's verdict, and it must be disregarded.

█ We are familiar with the rule invoked by defendants in error (22 Tex. Jur. p. 134, sec. 94), but it has no application here, for the reason that up until the execution of the Pevey lease, under which the Gulf Production Company claims, *the homestead had not been abandoned. Until the abandonment takes place, the husband's deed alone conveys nothing, and cannot be held as a restriction on the right of or as an impediment to the conveyance of the homestead to another in the constitutional and statutory way.* Stallings v. Hullum, 89 Tex. 431, 35 S.W. 2.

█ Under circumstances not necessary to be detailed here, the Turners reacknowledged the Joiner-Tucker lease of April 7, 1927, under which defendants in error claim, on October 18, 1930. The Pevey lease had been filed for record and was of record long prior to the date of the reacknowledgment. The defendants in error were therefore charged with notice of the conveyance to Pevey and his vendees, and can assert no title under the reacknowledged lease against them. It is only where intervening rights have not attached that the reacknowledgment of a defective conveyance may be effective. 1 Tex.Jur. pp. 563, 564, sec. 160; King v. Haley, 75 Tex. 163, 12 S.W. 1112; Kinnear v. Tolbert, Tex.Civ.App., 262 S.W. 900; Leonard v. Benford Lbr. Co., 110 Tex. 83, 89, 216 S.W. 382; 13 R.C.L., p. 1323, sec. 360; 1 R.C.L., p. 306, sec. 100; Smith v. Pearce, 85 Ala. 264, 4 So. 616, 7 Am. St.Rep. 44; Doe ex dem. De Peyster v. Howland, 8 Cow., N.Y. 277, 18 Am.Dec. at page 445; 1 C.J., p. 874, sec. 238, p. 767, secs. 37, 38; Richardson v. Woodstock, 90 Ala. 266, 8 So. 7, 9 L.R.A. at page 348; Parks v. Barnett, 104 Ala. 438, 16 So. 136; Durfee v. Garvey, 65 Cal. 406, 4 P. 377; Jackson ex dem. Stevens v. Stevens, 16 Johns, N.Y. at page 110; 1 Am.Jur., p. 385, sec. 163; C.J.S., Acknowledgments, volume 1, page 875, § 117.

█ In the absence of findings that the lease of the Turners to Pevey was invalid, and that the plaintiff in error, Gulf Production Company, knew or was charged with notice thereof (and there are no such findings in the record), the reacknowledgment of the void Turner-Joiner lease conferred no right, title, or estate on Joiner, Trustee, and his vendees.

At the time of the reacknowledgment the title to the mineral estate here involved was not in the Turners, but in Pevey, or his vendees, and the reacknowledged lease conveyed nothing.

On the whole, for the reasons stated above, we have concluded that the Turners had the right, in law, to convey the mineral estate here involved, notwithstanding the attempted execution of the lease of April 7, 1927, and the events which followed; that they had the right to execute the lease to Pevey, dated July 25, 1930; acknowledged August 2, and recorded August 8, thereafter, under which the Gulf Production Company claims title.

The judgments below against the Turners were erroneous, because the title to the mineral estate sued for was not in the defendants in error, but in the Gulf Production Company. The judgments against the Gulf Production Company were erroneous, because the title of that company

was superior to that claimed by the defendants in error.

The judgments of the District Court and of the Court of Civil Appeals, in so far as they authorize a recovery in favor of the defendants in error, and against the plaintiffs in error, G. G. Turner and wife, Sina A. Turner, and Gulf Production Company, will be reversed, and judgment rendered that as against said plaintiffs in error, the defendants in error shall take nothing. In other respects, the judgments of both courts will be affirmed.

SMEDLEY, J., not sitting.